1 Ill.2d 137 (1953)
115 N.E.2d 521
THOMAS HARRISON, Appellant,
v.
THE CIVIL SERVICE COMMISSION OF THE CITY OF CHICAGO et al., Appellees.
No. 32575.
Supreme Court of Illinois.
Opinion filed September 24, 1953.
Rehearing denied November 16, 1953.
*138 *139 KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, of Chicago, (HOWARD ELLIS, WALTER E. TINSLEY, THOMAS F. SCULLY, and CHARLES R. MORROW, of counsel,) for appellant.
JOHN J. MORTIMER, Corporation Counsel, of Chicago, (L. LOUIS KARTON, and SIDNEY R. DREBIN, of counsel,) for appellees.
Appellate Court reversed; superior court affirmed.
Mr. JUSTICE MAXWELL delivered the opinion of the court:
This appeal of plaintiff, Thomas Harrison, is being considered on a certificate of importance issued by the Appellate Court for the First District, which reversed a judgment of the superior court of Cook County, entered in a proceeding under the Administrative Review Act, wherein the superior court set aside an order of the defendant, Civil Service Commission of Chicago, discharging plaintiff from his position as a police captain in the classified service of the city.
This cause arose out of four charges of violation of regulations filed on November 25, 1950, by the commissioner of police of the city of Chicago with the Civil Service Commission of that city, against the plaintiff. He was accused of having accepted two loans in 1935 from persons of questionable character, accepting payments for acting as a guard for a construction company and of receiving $30,000 in 1937 for services rendered or pretended to be rendered to one John J. Lynch while a member of the police department without the consent of the commissioner of police. He was suspended the day the charges were filed.
Upon a hearing duly called and held the Civil Service Commission dismissed three of the charges and, by a vote of two to one, found plaintiff guilty of accepting and receiving $30,000, as charged in the last specification, and on March 6, 1951, ordered him dismissed.
*140 Plaintiff thereupon instituted proceedings under the Administrative Review Act in the superior court of Cook County, which set aside the findings and decision of the commission, and ordered plaintiff to be reinstated in his position in the department. The commission appealed from that judgment, and the Appellate Court reversed the superior court. Three separate concurring opinions were filed by that court, which ultimately issued a certificate of importance to this court to review the cause.
The evidence with reference to this infraction revealed that in 1931 Harrison met John J. Lynch at the office of a dentist, Dr. Michael F. Hoyne, who was a friend of both men. Prior to this meeting Lynch had been kidnapped by three unknown persons, and had secured his release by the payment of $50,000 and the promise of more funds. After the meeting the men became close friends, and were seen together frequently during plaintiff's off-duty periods until Lynch's death in 1945. After some six years of association and friendship between plaintiff and Lynch, including visits exchanged between their respective families, Lynch endeavored to persuade Harrison to enter some business which would yield a greater income than police work, and offered to finance plaintiff in such a venture. Plaintiff, however, preferred to remain in police work, which he would have to give up if he engaged in any other business. During the course of a dinner at the Drake Hotel in 1937 Lynch repeated his offer to finance plaintiff in a business, and put an envelope containing $30,000 in currency into plaintiff's hands, with the statement, "* * * buy some securities for your wife, your daughter, and yourself. In case you get shot in the line of duty they will have something, and if you don't you will have it for your older days." Plaintiff remonstrated at the gift and said that he never expected to be paid for anything he had done for Lynch, but Lynch replied that he had plenty more and not to worry about it, or about repaying the money.
*141 Although the charges alleged that Lynch was notoriously known to be engaged in the business of printing racing and other information used by bookmakers and generally reputed to be a professional gambler, the only complaining witness, police commissioner O'Connor, testified that he did not know Lynch, that the record of the department showed that Lynch had never been arrested for any offense, and that the commissioner merely heard in talking to unidentified persons that Lynch had at some time the reputation of being a gambler. Harrison testified that all during the years of their association Lynch was in a legitimate business or retired, and corroborating evidence was adduced that Lynch had been a part owner of the General News Bureau, a legitimate business enterprise which distributed a news publication of sporting events used by race-track habitues until 1934 when he sold out all his interest and retired.
As stated in appellees' brief, this case is unique in that, save as to character and reputation and matters of record, the evidence consisted almost exclusively of statements and testimony of the plaintiff. He, together with other police officers and city officials, had been called to testify in closed sessions before the Kefauver committee. Immediately thereafter at the request of his superior, he submitted a full report of his testimony. It was largely upon such report that he was suspended and later dismissed.
The charge here under consideration was that he had violated section 29 of rule 389 of the department, which subjects to disciplinary action any police officers for: "receiving or accepting a reward or gift from a person for a service rendered or pretended to be rendered, as a member of the Department, without the consent of the Commissioner of Police."
Plaintiff's record in the police department is impressive. He was appointed as a patrolman in 1922, promoted to sergeant in 1928, advanced to lieutenant in 1935 and made *142 a captain in 1938, which rank he held until the present proceedings were instituted. The advancements were made by the Civil Service Commission on the basis of "ascertained merit by competitive examination" and after investigation of merit and efficiency. The record shows that during his service he was awarded "Creditible Mention" and "Extra Compensations" for outstanding police work, courage and efficiency. From January, 1949, until his suspension, plaintiff was assigned to the command of the East Chicago Avenue police department. During that period the district was officially rated first with reference to clean-ups of crime among Chicago's forty police districts in the monthly police reports on eight occasions. The record in his district during the last ten months of 1950 revealed a high efficiency record, even though that district was the most difficult in the city.
The record shows aggressive police work in arresting, disarming and obtaining confessions of notorious criminals. On plaintiff's behalf numerous commercial enterprises, educational and philanthropic institutions, hospitals, organizations and individuals within his district submitted statements of confidence directed to the mayor and police commissioner. In his record several suspensions are noted, including one in 1943 pending the disposition of charges against him. The Appellate Court, in the case of Cartan v. Gregory, 329 Ill. App. 307, at page 318, stated, "Each plaintiff had an outstanding record in the police department * * *."
On this appeal it is appellees' theory that plaintiff had the duty to maintain the peace 24 hours a day; that his association with Lynch was carried on as a member of the department, even though it was conducted during his off-duty hours, and that the gift he received from Lynch was for such services. On the other hand, plaintiff maintains that his accompaniment of Lynch during off-duty hours was not a service rendered or pretended to be rendered as *143 a member of the department, nor did it become such merely because plaintiff was capable of protecting Lynch from reprisals by his previous abductors. He further maintains that the generous gift of $30,000 given some five years after the men became friends and associates, was not given or received for "a service rendered as a member of the department."
Appellees contend that it is not the province or within the power of the court to review the evidence with reference to the findings of fact of the Civil Service Commission pertaining to the cause for plaintiff's dismissal, while plaintiff argues that there is no evidence to support the charge and that, inasmuch as the courts are required under the law to reverse a decision by the Civil Service Commission where it is shown to be contrary to the manifest weight of the evidence, the decision of the Appellate Court was in error and should be reversed.
This cause involves essentially a determination of the scope of judicial review of an order of the Civil Service Commission. It is apparent from the three concurring opinions of the Appellate Court Justices, which recognize the inconsistencies in the decisions, that this legal question warrants clarification.
Prior to the enactment of the Administrative Review Act, decisions of the Civil Service Commission of the city were reviewed principally by common-law writ of certiorari. Under that writ a very limited type of review was permissible. Its limitations were aptly defined in Hopkins v. Ames, 344 Ill. 527, cited by defendant, where the court stated, at page 531: "The court has no power to pass upon the findings and conclusions of the inferior tribunal, but it may examine the proceeding to determine whether the inferior tribunal had jurisdiction, and the facts upon which the jurisdiction is founded must appear in the record, which also must show that the inferior tribunal acted upon evidence."
*144 As noted in the opinion of Justice Tuohy of the Appellate Court, as the number and activity of administrative agencies increased, the necessity for judicial review also expanded, and courts differed as to the scope of review permissible and proper under the constitutional doctrines. The inconsistencies arose in part from the nature of the proceedings before the agency, but largely because methods of review differed. Some were taken under the common-law writ of certiorari, some under the equally confining statutory writ of certiorari prescribed in the law setting up the agency. Others arose under proceedings derived from the common law, such as mandamus, injunction and quo warranto, and still others were statutory appeals. One group of cases suggests that it was improper to provide for appeals to the courts from certain agencies because they were nonjudicial bodies, hence authorizing a trial de novo in the court was unconstitutional as an imposition of administrative duties on the judiciary; (Borreson v. Dept. of Public Welfare, 368 Ill. 425; City of Aurora v. Schoeberlein, 230 Ill. 496; North Chicago Hebrew Congregation v. Board of Appeals, 358 Ill. 549;) whereas another group upheld the statutory right of appeal even though the agency was performing legislative rather than judicial functions; (Illinois Central Railroad Co. v. Ill. Commerce Com. 387 Ill. 256; Peoples Gas Light and Coke Co. v. Slattery, 373 Ill. 31;) or where administrative functions were involved. Investors Syndicate of America, Inc. v. Hughes, 378 Ill. 413.
It was the inconsistency of these cases, and the narrow scope of judicial review provided by available remedies which led to the enactment of the Administrative Review Act. Ill. Rev. Stat. 1951, chap. 110, pars. 264-279.
The Administrative Review Act, under which the proceedings in the instant case were commenced, applies to proceedings to review judicially a final decision of an administrative agency where the act creating or conferring *145 power on such agency, by express reference, adopts the provisions of the Administrative Review Act. (Par. 265.) Under section 41, added to the Civil Service Act in 1949, (Ill. Rev. Stat. 1951, chap. 24 1/2, par. 77a,) the provisions of the Administrative Review Act are made applicable to review decisions of the Civil Service Commission. The section of the Administrative Review Act defining the scope of such review (par. 274,) provides: "Every action to review any final administrative decision shall be heard and determined by the court with all convenient speed. The hearing and determination shall extend to all questions of law and of fact presented by the entire record before the court. No new or additional evidence in support of, or in opposition to, any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct."
These provisions have been construed to mean that while the courts do not have the right to reweigh the evidence adduced before the administrative agency, they do have the power and duty to consider the record to determine if the findings and orders of the administrative agency are against the manifest weight of the evidence. Drezner v. Civil Service Com. 398 Ill. 219; Secaur v. Civil Service Com. 408 Ill. 197; Oswald v. Civil Service Com. 406 Ill. 506.
In both the Secaur and Drezner cases the courts held that they could review the findings of the commission with reference to "cause for discharge" to determine whether the commission's determination that cause for discharge existed was contrary to the manifest weight of the evidence. In the Drezner case, the court stated, at page 231: "A review of the record discloses that the order and recommendation of the hearing board, as adopted by the commission, is against the manifest weight of the evidence, is not supported by substantial evidence in the record, nor do the *146 findings conform to evidence in the cause. For these reasons this cause must be reversed."
The Drezner case was noted in two of the opinions of the Appellate Court herein. Justice Tuohy however, without determining the proper scope of review, or whether the Drezner case correctly stated the law, held that the Civil Service Commission having lawfully determined that plaintiff violated a department rule which warranted his dismissal after a hearing which was regular and in conformity with law, it was error for the trial court to vacate the order of discharge entered by the commission. Justice Schwartz, in his concurring opinion, agreed with Justice Tuohy on the facts, but he was of the opinion that irrespective of the Drezner case, the court could examine the evidence only to determine whether the trial was a farce, or the conclusions of the commission unreasonable, capricious or arbitrary. The Justice cited as authority Hopkins v. Ames which, as hereinbefore noted, involved a review under the common-law writ of certiorari, and not under the Administrative Review Act. The court also cited Smith v. Civil Service Com. 343 Ill. App. 267, which appears in the reports merely as a memorandum opinion, but which, as originally drafted, merely cites Hopkins v. Ames as its authority, and makes no reference to the Administrative Review Act.
It is readily apparent that section II (par. 274) of the Administrative Review Act does not contemplate any such broad powers of review, for it is specifically provided in this provision that the findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct. The court is not authorized to weigh the evidence, nor to make its own independent determination of the facts, as under the statute involved in the Schoeberlein case. On the contrary, the type of judicial review authorized under the Administrative Review Act, whereby the court must regard the findings of the *147 agency as prima facie correct and is permitted to set them aside only if they are contrary to the manifest weight of the evidence, has traditionally been regarded as a judicial function, comparable to the issue at law as to whether there is competent evidence to support a judgment of a lower court. Roon v. Van Schouwen, 406 Ill. 617.
Moreover, the court reviewing the administrative decision is not allowed to hear new evidence, or in any way to redo the work of the administrative agency. Furthermore, the agency in the instant case, the Civil Service Commission, has itself been held to be quasi-judicial in character (People ex rel. Hurley v. Graber, 405 Ill. 331,) and the nature of proceedings and functions imposed upon the reviewing court by section 12 (par. 275) of the act, is essentially judicial in character.
Under these circumstances we are of the opinion that the scope of review provided by the Administrative Review Act does not offend the constitutional doctrines of separation of powers. This court is therefore obliged, under the Administrative Review Act to examine the record and determine whether the findings of the commission are supported by any evidence.
Appellees have urged, however, that this court is bound by the findings of fact of the Appellate Court. We are cognizant of the provisions of the Civil Practice Act, which provide that the statement of facts by the Appellate Court shall be final as to all matters of fact in controversy, and that the Supreme Court shall re-examine cases brought to it by appeal from Appellate Court as to questions of law only. Ill. Rev. Stat. 1951, chap. 110, pars. 213, 216(3)(b).
Nevertheless, it is equally well established that the finding of fact of the Appellate Court can be inquired into by the Supreme Court where there is no evidence upon which to base the finding; and the determination of whether there is any evidence in the record, to support the finding of fact, is a question of law which the Supreme Court is obliged to *148 determine. Sterling-Midland Coal Co. v. Great Lakes Coal and Coke Co. 334 Ill. 281; Lain v. Metropolitan Life Ins. Co. 388 Ill. 586; Ahlenius v. Bunn & Humphreys, Inc. 358 Ill. 155; Seiders v. Henry, 347 Ill. 467; Roon v. Van Schouwen, 406 Ill. 617; Illinois Trust and Savings Bank v. Northern Bank and Trust Co. 292 Ill. 11.
As we ruled in the case of Walden v. Chicago and North Western Railway Co. 411 Ill. 378, 386, "The rule is well settled that this court will not review the facts as found by the Appellate Court, unless the facts so found, in themselves, show that as a matter of law a wrong conclusion was reached by that court. (Briney v. Illinois Central Railroad Co. 401 Ill. 181; Langston v. Chicago and North Western Railway Co. 398 Ill. 248.)" There is nothing to the contrary in the cases cited by appellees.
It is also incumbent upon this court to consider the additional question of law  the application of the police regulation to the facts herein. That administrative regulation has the force and effect of law, and its interpretation by the Appellate Court is not binding upon this court. In fact none of the opinions issued by the Appellate Court included any analysis of the purport and meaning of the regulation allegedly infringed by appellant.
As hereinbefore noted the only charge found by the commission to constitute cause for discharge was the violation some 13 years before of section 29 of rule 389 of the police department. This rule subjects to disciplinary action all members and employees of the department for "receiving or accepting a reward or gift from a person for a service rendered, or pretended to be rendered as a member of the Department without the consent of the Commissioner of Police."
As a general canon of statutory construction a rule should be construed so as to give effect to each word, clause or sentence in order that no such word, clause or sentence may be deemed superfluous or void. (Winner v. Kadow, *149 373 Ill. 192.) It is apparent that to constitute an infraction of the rule it must appear that the unreported gift must have been accepted for a "service rendered as a member of the Department." Thus it is essential that the gift be given not merely for a service rendered, but one rendered as a member of the department. The rule clearly does not prohibit a policeman from accepting all gifts; nor does it refer to all gifts accepted while a person is on the police force, or just because a person happens to be a policeman. The phrase "as a member of the department," must be construed to mean, in the character of a police officer, whereby the various legal powers, official knowledge, or authority, or perquisites incident to the position of policeman are employed for the benefit of the person served, who has given the gift in return for such services.
The record must therefore be reviewed in the light of the type of conduct meant to be penalized by this rule. From the casual meeting of appellant and Lynch in the office of a dentist friend shortly after Lynch's kidnapping experience, and from the fact that they were frequently seen together in public places during appellant's off-duty periods, the commission inferred not only an employment agreement, but an agreement to render services "as a member of the Department." This finding was approved by the Appellate Court in Judge Tuohy's opinion wherein it is stated: "It is apparent from appellant's testimony that he himself considered it within the legitimate scope of his duties as a police officer to afford Lynch protection the latter requested, and that he was acting at least at the beginning of the association in the capacity of a police officer."
That factual finding is not supported by a scintilla of evidence, on the contrary, it is rebutted by the only testimony on this issue, and by the uncontroverted circumstantial evidence. Harrison, who offered the only evidence in the record on this issue, testified: "I did not consider that *150 I was doing work as a member of the Police Department at any time when I acted as a body guard.... I acted in the capacity of a friend who guarded Mr. Lynch in the event there was trouble to him from parties who might be his enemies."
Of the other circumstances rebutting this finding of the Appellate Court, it is uncontroverted that, unlike appellant's regular work, this association with Lynch was completely unscheduled, and sporadic; the association took place at a time when appellant was not "on-duty" or in the course of performing his official work; and there is no evidence that appellant ever wore his uniform, or used his police equipment, or other perquisites of his office for Lynch's benefit. Therefore, it is not clear how appellant could be rendering "police services as a member of the Department."
It may be noted further that the gift to appellant was made while he was still a sergeant on the force, and therefore, at that time he was not subject to police call to the same extent as when he subsequently became captain. While he was obliged to conduct himself at all times in a manner befitting an officer of the law, he could not be deemed to be "on duty" at all hours of the day or night according to the city rules. This in no way modifies the principle that civil service employees can be discharged for conduct during off-duty hours where such conduct is affected with moral turpitude as in Joyce v. City of Chicago, 216 Ill. 466; Bloomquist v. Rehnberg, 280 Ill. App. 1; People v. Allman, 314 Ill. App. 194, and Hayes v. Civil Service Com. 348 Ill. App. 146, cited by defendants. Nor do we hold, or even imply that off-duty conduct is beyond the power of surveillance of the administrative authorities, or encroach upon their power to discharge from the police department members upon proper charges involving off-duty conduct. In the instant case, the act of accompanying an individual to discourage violence upon him is not conduct affected *151 with moral turpitude, hence those cases, while they correctly articulate the law, are not determinative.
We merely conclude that had appellant accompanied Lynch during his regular duty hours, it might possibly have been inferred from his mere presence that he was acting in an official capacity. However, no such inference could be made from his mere presence with Lynch during non-duty hours. Furthermore, the time of the assocation is just one factor in determining whether appellant was acting in his official capacity, and the Appellate Court inferred, merely from the fact that the men were seen together at all that Harrison was acting in his official capacity. The broadest inference which the evidence will admit is that it was advantageous for Lynch to be seen with a man of Harrison's recognized courage and reputation, and that the association may have tended to discourage any further violence upon Lynch. That advantage is far removed from the conclusion that Harrison was acting in his official capacity as a member of the police force. Hence that finding of the Appellate Court is unsupported by any evidence and should not be deemed binding upon this court.
The Appellate Court in Judge Tuohy's opinion further found that the gift was accepted in return for a service rendered as a member of the department, within the terms of the regulation. Upon the first gratuitous assumption that appellant acted as a member of the department, the court built the further unwarranted presumption that the money must have been given for that police service, and that because appellant stated that he did not expect to be paid for anything he had done, he must be referring to services rendered as a member of the department. Those presumptions cannot be substituted for evidence.
The only evidence in the record pertaining to why the gift was given rebuts the inference that it was given "in return for services rendered." In the first place, the association *152 took place over a period of some six years preceding the gift, during which time there was no discussion or arrangement for payment, and the association continued, and was to continue, into the indefinite future, long after the gift was given. That factor, as well as the tremendous amount of the gift, negatives the inference that the gift was the quid pro quo for a contract of employment or particular services rendered. The record clearly indicates that the gift was the product, solely, of a sympathetic desire on the part of Lynch to give Harrison, his wife and daughter, a measure of economic security.
Furthermore, at the time the gift was made, Lynch and Harrison had been good friends for many years, and exchanged family visits. Lynch first offered to put Harrison in business, and when he replied that he preferred to remain on the police force, Lynch expressed concern over the financial security afforded Harrison's family if he were killed in the line of duty. It was after that discussion that Lynch gave Harrison the envelope containing the money. He then stated that he had plenty of money, but no children or other obligations, and that he liked Harrison and wanted to see him get along, and therefore suggested that Harrison invest the money in securities for his family. Had Lynch given the securities to the family, no inference would have been drawn that the money was given in return for police services, yet that is what Lynch intended. Thus, from the evidence, the motive for the gift was not for services rendered, nor did it become so because appellant stated that he did not expect anything for whatever he did.
Moreover, even if appellant's testimony as to why the money was given is completely discounted, there is still no other evidence showing a different reason why the gift was given. The mere fact that the gift was made  which fact Harrison readily admitted  does not establish the essential requirement under the police regulations, that it be given in return for services as a member of the department. The *153 Appellate Court assumed this essential link, without evidence in support thereof; hence, this court is not bound by that factual determination under any provision of the Civil Practice Act.
The Appellate Court, however, did not consider the issue of whether appellant was guilty of conduct unbecoming an officer in violation of section 3 of rule 389 as found by the commission. In predicating its decision upon the alleged violation of the rule prohibiting the acceptance of gifts for services rendered as a member of the department, the Appellate Court apparently regarded the charge of conduct unbecoming an officer as the weaker ground for dismissal.
In determining whether that charge is substantiated by the evidence, it is evident that appellees' statements that the police department in many respects resembles a military force in that there is the same necessity of discipline, (Coane v. Geary, 298 Ill. App. 199,) and that the discharge of a police officer for conduct unbecoming a member of the department is not only for the purpose of punishing the officer, but for the protection of the public, (Mohr v. Civil Service Com. 172 N.W. (Iowa) 278,) undoubtedly are a correct presentation of the law.
Appellees further urge that the conduct of Harrison in accompanying Lynch during his off-duty hours to discourage violence upon him, and the acceptance of a gift from Lynch constituted conduct unbecoming an officer. The evidence, however, clearly establishes that Lynch sold his interest in the publication that carried racing news before the parties met. The only evidence discrediting Lynch was the statement by the commissioner that he thought from newspaper accounts that Lynch had a reputation as a gambler. There is no evidence in the record that Lynch engaged in gambling, or any other immoral activity while appellant accompanied him, or during their association. Moreover, appellant at no time made a secret of the association, *154 yet with full knowledge of that situation the department promoted Harrison to the rank of captain and conferred awards of merit upon him during the period when the men were frequently seen together. Nevertheless, now, some 21 years after the men became acquainted and began associating, some 15 years after the gift was made, and some 5 years after the death of Lynch, it is urged that appellant's conduct at that time warranted dismissal from the force for cause, and that his retention on the force now would be demoralizing. If the association was in any way improper, whatever demoralizing effect it could have had, would have been when the association took place, and not now, after the man has been promoted and rewarded for his work for the department.
This court properly takes judicial notice of certain problems in crime existing in the city of Chicago, as suggested in Gaca v. City of Chicago, 411 Ill. 146, cited by appellees, but that circumstance does not convert appellant's acts some 15 years ago into conduct unbecoming an officer or constitute cause for his discharge.
It is our opinion, therefore, that the finding of the commission that Harrison violated police department rule 389, sections 29 and 3, and that such conduct constituted cause for discharge is without evidentiary support, and the superior court properly set aside the order of the commission. It was error, therefore, for the Appellate Court to reverse the decision of the superior court, hence the judgment of the Appellate Court must be reversed.
Appellate Court reversed; superior court affirmed.
SCHAEFER, C.J., and HERSHEY, J., dissenting:
We agree with the holding of the court that the constitutional doctrine of separation of powers is not violated when the findings of an administrative agency are reviewed under the Administrative Review Act to determine whether they are contrary to the manifest weight of evidence. We *155 agree also with the holding of the court, that the statute makes conclusive upon us the findings of fact of the Appellate Court, and that unless we can say either that the evidence on which that court relied, taken with all its favorable intendments, was not sufficient to sustain its findings, (Roon v. Van Schouwen, 406 Ill. 617; Goodrich v. Sprague, 376 Ill. 80,) or that the findings of fact are insufficient in law to establish a violation of the regulation, (Alton Railroad Co. v. Gillarde, 379 Ill. 308; Fichter v. Milk Wagon Drivers' Union, 382 Ill. 91,) we must affirm the judgment of the Appellate Court.
Our difference is with the determination of this court that the pertinent police department regulation is not applicable to the facts as found by the civil service commission and the Appellate Court, and that there is no evidence upon which the facts so found can be based. Since these issues turn so largely upon the evidence, a somewhat more complete discussion of the undisputed facts than appears in the opinion of the court is necessary.
A violation of the applicable rule presupposes two elements: the rendition of services "as a member of the Department," and the acceptance of a gift for them. We consider the latter issue first. Concerning the reason for the gift of $30,000 from Lynch to Harrison the record shows that Harrison was ordered to report to the commissioner of police concerning his testimony before the United States Senate investigating committee on organized crime. His report states: "The Committee asked me what I had done for Lynch that he would give me $30,000 in cash. I told them that Lynch was kidnapped in 1931. Men by the names of Yates and Moore were arrested as suspects. Later, men named Swolley, Souders and Jones were also arrested as suspects. Although the police said they were the men that kidnapped Lynch, Lynch never identified them or testified against anybody right up to the time he died. Lynch never thought that the real kidnappers were apprehended. The *156 kidnappers took $50,000 from Lynch and had demanded further payments of $200,000. I told the Committee that Lynch would call me, and, on my times off from work, I acted as a bodyguard and a friend. I was with him from time to time. There was no fixed schedule. I told them that I did not report this gift that was given off duty."
Other evidence in the record as to the reason for the gift also comes from Harrison: "So, two or three nights later I met him [Lynch] at the Drake Hotel, he and I together, and we had dinner at the Drake Hotel and he gave me an envelope with $30,000 in it in hundred dollar bills. He told me, `Here, buy some securities for your wife, yourself and your daughter; in case you should get shot in the line of duty, they will have something, and if you don't you will have it for your older days.' I said, `Jack, you know that anything I have done for you, I never expected to be repaid.' He said, `I know that.' I says, `From the way this envelope feels, there is plenty of money in there.' He said, `Yes, I have plenty more, so don't worry about it and don't worry about repaying it.'" Concerning this testimony the Appellate Court said: "* * * it was not unreasonable for the Civil Service Commission to conclude that the payment made to plaintiff was a gift for this service admittedly performed. Indeed, plaintiff's own reaction at the time the $30,000 was handed to him would seem to create an inference that he considered it in recognition of services rendered, as indicated by his statement: `Jack you know that anything I have done for you, I never expected to be repaid.'"
On the basis of these two statements, by Harrison himself, we do not understand how it can be said that the finding that the gift of $30,000 was for services rendered by Harrison as Lynch's bodyguard is without support in the evidence.
On the issue as to whether or not the services rendered by Harrison were rendered as a member of the police department, *157 the Appellate Court found that from the circumstances in which appellant's relationship with Lynch arose an inference could be reasonably drawn that the latter had formed the association for the purpose of securing protection by a police officer against physical attack. Alternatively that court held that whatever the motives for appellant's acting as a bodyguard, the services were essentially a police function, and that this in itself made out a case of services rendered as a member of the department.
In disposing of this issue, this court states that the Civil Service Commission "inferred not only an employment agreement, but an agreement to render services `as a member of the Department.'" Reproducing the text of the commission's findings hardly seems warranted. It is perhaps sufficient to state that the commission made no reference as to any agreement, of employment or otherwise, for the rendition of service.
The commission did find, however, that the services were rendered "as a member of the Department." Furnishing bodyguards is a routine police function, as the commission pointed out. The opinion of the court, however, takes the position that this routine police function assumes a different character in this case.
Harrison testified: "Q. And what did you do when you were with him? A. Well I went around with him. I took him wherever he wanted to go. Naturally, I was a police officer and I acted, probably, in the capacity of a bodyguard for him." This court in its opinion draws every possible inference except the natural one drawn by the commission and the Appellate Court  that Lynch wanted a policeman to serve as a bodyguard, and got Harrison to do it. As the Appellate Court pointed out, the relationship did not originate in friendship. That came later. Harrison began serving as Lynch's bodyguard shortly after Lynch was kidnapped. They were introduced by a "police fan." In our opinion there is no justification for *158 attributing the relationship to Lynch's desire "to be seen with a man of Harrison's recognized courage and reputation," and ignoring the dominant fact that it was also to Lynch's advantage to be seen with a sergeant of police.
The distinction which the opinion of the court draws between "off-duty" and "on-duty" powers and duties of a police officer is wholly without warrant. No authority is cited to support it. The powers and the duties of a police officer are not turned on and off by the hands of the clock. The commission found: "As testified by the respondent, it was his understanding that, except when on furlough, a police officer is on duty twenty-four hours a day and that for all purposes he is throughout such twenty-four hours still a member of the Police Department of the City of Chicago with the right and duty to preserve peace and tranquility."
The remaining question is whether or not appellant's discharge was justified upon the ground that he was guilty, as charged, of conduct unbecoming a police officer. The commission found that he was. The Appellate Court, having sustained his discharge on another ground, found it unnecessary to pass upon that charge. We think that the majority opinion properly considers this issue, but reaches a result which the evidence does not warrant.
The basis of this charge is that the appellant, a police officer, served as bodyguard for a man generally reputed to be a gambler. The opinion of the court seems to dispose of this charge upon the ground that there was no proof that Lynch actually was a gambler. Under the charge such proof was not required. What was involved was Lynch's reputation, not his actual guilt or innocence.
Nor can the evidence of reputation, in our opinion, be minimized. On the issue of Lynch's reputation, the commissioner of police testified: "Referring to John J. Lynch who is mentioned in these charges, I have a knowledge of his general reputation. His general reputation was that he *159 operated handbooks, that he was one of the owners and operated the General News Service which was a racing news service used by handbook operators throughout the city for the furtherance of their business." No evidence of reputation was offered to rebut this testimony. It seems obvious that serving as bodyguard for one who is reputed to be a gambler, with or without the acceptance of a substantial gift in connection with that service, would inevitably reflect discredit upon the police force, and that the commission was warranted in finding that the appellant was guilty of conduct unbecoming a police officer.
On this issue the majority opinion also resorts to a theory which seems to resemble that of condonation in divorce cases, stating: "Moreover, appellant at no time made a secret of the association, yet with full knowledge of that situation the department promoted Harrison to the rank of captain and conferred awards of merit upon him during the period when the men were frequently seen together." Concededly the department had no knowledge of the gift which Harrison received. There is no evidence in the record on which to base an assumption that the police department knew of Harrison's services as a bodyguard for Lynch. Knowledge of these facts first came to light when Harrison testified before the United States Senate committee investigating organized crime. The only evidence which suggests that anyone knew of the appellant's activities in connection with Lynch is in his testimony, "At the time when I accompanied Lynch as sort of a bodyguard or just as a friend, or both, I was always subject and available for emergency police duty. I always told my wife where I was and she knew where to get hold of me."
To us it seems clear that a municipality is entitled to hold its police officers to a higher standard of conduct than that which has been manifested by the appellant in this case. In our opinion the judgment of the Appellate Court should be affirmed.