**Harvey McCaffery, Appellee, v. Civil Service Board of Chicago Park District, William L. McFetridge et al., Members of Civil Service Board of Chicago Park District; George A. Otlewis, Chief of Police of Chicago Park District; and George T. Donoghue, General Superintendent of Chicago Park District, Appellants.**

**Gen. No. 46,630.**

First District, Second Division.

September 20, 1955.

Rehearing denied October 25, 1955.

Released for publication October 25, 1955.

Philip A. Lozowick, General Attorney, Chicago Park District, for appellants; Harry R. Posner, Assistant General Attorney, Chicago Park District, of counsel.

Michael F. Ryan, of Chicago, for appellee; Richard F. McPartlin, Jr., of Chicago, of counsel.

PER CURIAM.

This action was brought under the Administrative Review Act to review an order of the Civil Service Board of the Chicago Park District. The Board had ordered the plaintiff discharged from the position of patrolman in the classified service of the Chicago Park District. On the first hearing the trial court remanded the cause to the Civil Service Board with instructions to strike from the record all hearsay evidence which it received on the original hearing, and for the taking of such additional evidence as the parties desired to present with respect to the charges, and at the closing of the proof to make its findings and decision in conformity with law. A further hearing was held by

the Civil Service Board. The hearsay evidence was stricken from the record, after which the Board by its findings and decision again ordered the plaintiff discharged. The trial court reversed the findings and decision of the Civil Service Board and this appeal is taken from such judgment.

The theory upon which the defendants rely on this appeal is that the trial court erred when it entered its judgment reversing the Civil Service Board and found that the charges filed against the plaintiff were not proved by clear and convincing evidence and that the Board's findings and decision were against the manifest weight of the evidence.

From the testimony in the record taken before the Civil Service Board of the Chicago Park District in support of the charges filed against the plaintiff, it appears that on October 18, 1953 two police officers, Ytsen and Mikol, of the Chicago Park District, operating in a squad car at about 1:00 a. m., noticed an automobile which had Louisiana license plates and was weaving. The police officers stopped the car and took into custody the driver and another man with him. On a search of the car a loaded revolver was found under the seat. The revolver belonged to one of the men in the car. It had been in his pocket, and on the approach of the police he placed it on the seat. The other man thrust it under the seat where it was found by the police officers. Additional ammunition for the gun was found on one of the men and a knife on the other.

Ytsen and Mikol called the station and two other officers came with a squad car and assisted them in taking the prisoners, and the car in which they were riding, to the Garfield Park police station. When they arrived at the station the plaintiff was present. The plaintiff at that time was a patrolman working in citizen's dress. The two prisoners were placed in separate

rooms. One of the arresting patrolmen made out the reports on the gun, the gun card and the gun slip, and the other made out the arrest slips. When the prisoners were taken to the station, Sergeant Hoffman, who was in charge of the station, was informed of the presence of the prisoners and that they had had a gun with them. The arrest slips, the gun card and the gun slip were left on a desk in the station by the arresting officers. One of the arresting officers placed the gun in his locker and the next day gave it to Sergeant Hoffman. As the arresting officers were about to leave the station the plaintiff told them that he would talk to the prisoners. The officers left the station at about 2:05 or 2:10 a. m.

The plaintiff questioned Taylor, one of the prisoners, about the possibility of having someone make a bond for them, and ascertained that Taylor was living with a man named Turner, to whom the plaintiff then telephoned. Turner then came to the station, and the plaintiff said that a $500 bond would be necessary. Subsequently he reduced the amount to $300. Taylor had a grandfather who lived in Monroe, Louisiana. Turner told the plaintiff that he would call the grandfather if it would be agreeable to the plaintiff. The latter assented and told Turner that there was a telephone in the hall which he could use. Turner called the grandfather, which call was verified by a record of the telephone company received in evidence. Turner got $27 from Taylor and $33 from Lewis, the other prisoner. This money was given by Turner to the plaintiff, and the plaintiff told Turner that if he would bring $300 which was to be sent by Taylor's grandfather from Louisiana that he, the plaintiff, would tear up the papers and release the prisoners and there would be no court hearing. He told them not to bring the $300 until after 12:30 the next night. The prisoners then left the police station at about 3:30 or 4:00 that morn-

ing without being booked or any bond having been made.

After arresting another prisoner, officers Ytsen and Mikol again returned to the station about 3:30 or 3:40, and they saw the plaintiff at the station at about 4:00 or 4:05, at which time the plaintiff gave Officer Ytsen $24 from the $60 which the plaintiff had received from Turner, $12 of which Ytsen gave to Mikol, and the plaintiff told Mikol that there was to be $300 more coming the following night.

Later that day, about noon, Taylor talked to a captain of the Maywood police about what had happened. Captain Fleming of the park police was then contacted. In the meantime Taylor had received $300 via Western Union from his grandfather in Monroe, Louisiana. Captain Fleming marked the bills. The chief of the park police, Captain Fleming and Captain Begner went with the two prisoners to the police station about midnight. On the books at the station the plaintiff was shown to have reported as sick at about 10:30 p. m. He was ordered to come to the station. Both prisoners identified him. Ytsen and Mikol were called and they identified the prisoners as the ones whom they had arrested the previous night. The plaintiff denied that he had ever seen the two prisoners before and said he did not remember whether or not he had interrogated any colored boys the night before. He said he was in and out of the station the previous evening but he could not remember the time, nor could he remember whether he had seen the two patrolmen at the station. The plaintiff had an almost complete lapse of memory as to any of the things which he had done that night. He made a written report that he had performed routine duties and that nothing unusual had happened.

The plaintiff in his own behalf testified that on the night in question his hours of duty were 1:00 to 9:00 a. m. He arrived at the station at 12:45 and reported

169

to Sergeant Hoffman, who told the plaintiff that his partner was sick and that he (the plaintiff) should pick up his assigned squad car at the garage where it was being greased, start his tour of duty and come back in a couple of hours and pick up Officer Collins who would work with him. The plaintiff, after five or ten minutes, left the station, drove to the garage, picked up his squad car, had it refueled, and went to a restaurant at Jackson and Canal streets for a cup of coffee. When he came out he heard a call that city police had prisoners trapped in a building at Walnut and Homan streets, to which place he then went. He gave help to the police and talked to park police Officer DeFily. Patrol Sergeant Flynn, the supervisory officer of the plaintiff, was also at the scene. Plaintiff then went back to the station, where he arrived about 3:00. He then left the station at 3:00 or 3:05 with Officer Collins, and in the first hearing testified he did not return to the station until 9:00 that morning. His memory refreshed upon being shown a radiogram message for him to go to the station at 6:55 and a record showing that he had complied with the request, he testified that he did return to the station at about that time. He denied that he had seen either the arresting patrolmen or the prisoners, and stated that he was not in the station at 2:15, 2:20 or 2:25, at the time officers Ytsen and Mikol testified that he was. He denied that he talked to the prisoners, that he negotiated with them for their release, and that he took any money from them.

The garage which serviced the park police cars and which was located approximately two or three and one-half blocks from the police station issued a gasoline ticket, signed by plaintiff, which was stamped 1:33 a. m. on the morning of October 18th, and the attendant at the gas station testified that that was the time he punched the ticket before filling the tank of the plaintiff's car.

Desk Sergeant Hoffman, who was one of the respondents at the original hearing, testified that he did not see the plaintiff the night in question from the time plaintiff went to get his car until the time the latter came in and picked up Officer Collins, nor did he see him subsequently that morning before the time he checked out at 7:00 or 8:00. Sergeant Hoffman did not remember seeing the arresting patrolmen in the station with the prisoners, nor did he remember seeing Turner. He testified that the plaintiff was not at the station at 1:30 or 1:40 a. m., and that after he saw the plaintiff at the station between 2:30 and 3:00 he did not remember seeing him leave the station, but stated he did not see him in the station from that time till about 8:00 a. m.

Officer Collins testified that the plaintiff had reported at the station between 12:45 and 1:00 a. m. and had left the station shortly after. He again saw him about 3:15 and again shortly after 3:45 a. m. when the plaintiff came in and they went out together in a squad car, and neither returned to the station until 9:00 in the morning. He did not remember returning to the station as the radiogram directed and records showed they did. Neither did he remember seeing the prisoners around the station.

Park police Officer DeFily testified that he saw the plaintiff about 2:25 or 2:30 on the morning of October 18th in the vicinity of Walnut and Homan streets, where they were making an investigation of a burglary. Sergeant Flynn, the supervisory sergeant at Garfield Park station, testified that he was present at the Walnut and Homan street investigation, and that he did not see the plaintiff there.

The plaintiff also testified at the original hearing that on October 18th he reported about 10:30 that he was sick; that he had been home all day until about 10:00 or 10:30 when he went to Kedzie and North avenues to get a jar of Vick's, and that at no time during

that night was he in the vicinity of 1300 north Western avenue. Captain Begner testified that on October 18th, at about 11:05 p. m. he saw the plaintiff drive from 1400 to 1200 on Western avenue. At the second hearing the plaintiff testified that he was not positive as to whether he had been at 1300 Western avenue or not, but that he had gone to 2300 or 2400 north Western avenue to pick up his glasses which he had left in a car. He did not remember the route which he took.

The gun taken from the prisoners had been given by one of the arresting officers to Sergeant Hoffman. On the night of October 18th, when the chief of the park police was in the station, Officer Mikol got the gun from Sergeant Hoffman, who took it from his locker, and gave it to the chief. The gun was introduced in evidence at the hearing.

Evidence was introduced as to the good character of the plaintiff, and his civil service record, which is in evidence, showed the plaintiff had been appointed a patrolman December 6, 1947; that he had received two letters of commendation; that he was suspended October 17, 1951 pending an investigation of charges, which suspension was subsequently set aside by the Civil Service Board and he was restored to duty; that his efficiency marks for 1951, 1952 and the first three-quarters of 1953 were either "satisfactory" or "very satisfactory."

The plaintiff's theory here is that the Civil Service Board erroneously at the second hearing struck from the record the hearsay evidence introduced at the first hearing, heard additional evidence and made its findings on the evidence permitted to remain in the record of the first hearing, plus the additional evidence introduced; that the Civil Service Board erred in denying the plaintiff a continuance, and thus a severance, at the first hearing before the Board; that the Board erred by discharging the plaintiff while it merely sus-

172

pended the two patrolmen and the desk sergeant who were respondents, together with the plaintiff, in the first hearing; that the findings were not supported by clear and convincing evidence. At the first hearing the plaintiff was tried together with Sergeant Hoffman and patrolmen Ytsen and Mikol.

■ The plaintiff here contends that the hearing before the Civil Service Board was not fair in that it should have granted the plaintiff a severance. However, the record does not indicate that a motion for severance was made on behalf of the plaintiff. He did ask for a continuance which was overruled. A motion for a continuance is not equivalent to a motion for severance, and so that question is not before us. Even if a motion for severance had been made, the granting of it was within the discretion of the Civil Service Board, and there is no showing here that the plaintiff would have been prejudiced by such refusal even if it had been made. People ex rel. Egan v. Dunham, 314 Ill. App. 110.

The plaintiff also strenuously contends that the Civil Service Board acted improperly when the cause was remanded to it by the trial court by its order of May 25, 1954. The plaintiff urges that the Civil Service Board should have held an entirely new hearing and should not have proceeded by striking out the hearsay evidence in the record, permitting the introduction of new and additional evidence and making its findings thereon.

■ The order of the trial court was that the finding and decision of the Civil Service Board "ordering the discharge of the plaintiff, Harvey McCaffery, . . . be and the same is hereby reversed and set aside," and it was further ordered that the "cause be remanded to the Civil Service Board of the Chicago Park District for the taking of such additional evidence . . . as the parties in interest may desire to present with respect to the charges, and that at the

173

closing of the proof make its finding and decision in conformity with law. The Board is instructed to strike from the record all hearsay evidence which it received in the original hearing." The Board with scrupulous accuracy followed this order. In Ford Motor Co. v. National Labor Relations Board, 305 U. S. 364, it was held that a remandment by a court to an administrative board does not dismiss or terminate the proceedings. If findings are lacking which may properly be made upon the evidence already received, the court does not require the evidence to be reheard, and if further evidence is necessary and available, that evidence may be taken. Here the action of the Civil Service Board was in accordance with the order of the Circuit Court and was valid under the law.

■ The plaintiff also, in discussing this question, argues that the Civil Service Board, in holding a hearing upon charges, is acting in a quasi-judicial capacity, and that consequently the rule that where an appellate court reverses a trial court for errors in the introduction of evidence and remands the cause a trial de novo is required. We have indicated that such rule is not applicable in the remandment of a cause to an administrative body. It will serve no good purpose to discuss here the meaning of the term "quasi-judicial capacity" of an administrative body. In Bartunek v. Lastovken, 350 Ill. 380, 383, the court points out that certain acts of the Civil Service Commission in a hearing are administrative or executive. The Supreme Court, mindful of the division of rights and powers among the administrative, legislative and judicial branches of government which are imposed by our Constitution, has delineated the scope of permissible judicial review of the findings of the Civil Service Commission, which principles have been reiterated by us in the opinion in Nolting v. Civil Service Commission of Chicago, 7 Ill.App.2d 147, filed this day. The principles therein set out are binding on us here.

174

In its finding No. 1 the Civil Service Board of the Park District had found that the plaintiff was guilty of acts of moral turpitude and gross impropriety damaging to the reputation of the service in violation of Rule VII, Division 2, Section 12 of the Rules of the Civil Service Board. These rules were not introduced in evidence, nor do they appear in the findings of the Civil Service Board, and plaintiff contends that because of this omission there was no evidence in the record to support the findings of the Board. In People v. City of Chicago, 127 Ill. App. 118, where a similar objection was made, the court says:

"Petitioner made no objection to such charges. If they 'did not state facts sufficient in law to constitute an offense,' it was his duty then and there to object to them. Not having done so, it was afterwards too late for him to raise that question.

"What rule 67 is, or contains, we are not informed by this record; but, as the board had jurisdiction of the subject-matter and of the person of the defendant, in the absence of evidence to the contrary, the presumption is that rule 67 contains matter which if violated would warrant the discharge of the offender, and that the charges did state facts sufficient in law to place the petitioner on trial, and, if proved, to justify the finding of guilty. State v. Kirkwood, 15 Wash. 298.

"In Joyce v. City of Chicago, 216 Ill. 471, the Supreme Court say: 'It is also urged that the charge filed with the commission by the general superintendent of the police is not sufficiently specific. This proceeding is not a common law or criminal proceeding, but an investigation. While the plaintiff in error had the right to have the charges preferred against him reduced to writing and in such form that he could clearly understand the ground assigned for his removal, it was not necessary that the charge should be formulated in technical language similar to that of a declaration or indictment.' And they cite with ap-

175

proval State v. Common Council of the City of Superior, 90 Wis. 612, where it is said: 'These principles govern the charges made as well as the procedure. The charge does not need to be drawn with the accuracy of an indictment. It is sufficient if the accused be furnished with the substance of the charge against him.' See also Heaney v. City of Chicago, 117 Ill. App. [405], 414, and cases cited."

█ There was sufficient evidence in the record to support the findings of the Civil Service Board of the Chicago Park District. Under these findings it cannot seriously be denied that the conduct of the plaintiff involved acts of moral turpitude and gross impropriety damaging to the reputation of the service.

In its finding No. 2 the Civil Service Board also found that the plaintiff was guilty of conduct failing to conform to the standards of the service and failing to contribute to the efficiency and dignity of the service, and plaintiff in his brief raises no objection to this finding.

The plaintiff also objects to finding No. 4 of the Civil Service Board that he induced an officer to commit an illegal act, and argues that Ytsen and Mikol committed the illegal act in accepting the bribe freely and voluntarily and without inducement or coercion and that even if all the evidence against the plaintiff were believed, he had not induced them to go astray. There is evidence in the record that if the plaintiff had not intervened the police officers would have taken the prisoners to the 25th district police station to be locked up. The intervention of the plaintiff at the time when the arresting officers were leaving the station was the prime cause from which all the other events followed. In any case, the argument on this point made by plaintiff advances an extraordinary ethical viewpoint.

As to finding No. 3 of the Civil Service Board that the plaintiff had accepted a bribe as an inducement to failing to make an arrest, the only objection urged

176

here on the part of the plaintiff is that there was conflict in the testimony. That there was conflict in the testimony is evident from the record. The purpose of the hearing before a Board such as this is to enable the Board to resolve such conflicts and from the evidence determine what the facts are. This the Board did, and its finding is supported by the evidence. That finding alone would be sufficient to warrant the discharge of the plaintiff.

██ ██ It is also urged by the plaintiff that the action of the Civil Service Board was arbitrary in that it discharged the plaintiff and at the same time suspended the two arresting officers and the sergeant in charge. The Board in determining the extent of the penalty inflicted upon the respondents had the right to take into consideration the evidence that the plaintiff took the initiative and was primarily instrumental in working out the scheme by which the prisoners would be liberated providing certain monetary payments were made. The trial court has only the power to consider the evidence to determine whether the findings and decision of the Civil Service Board are against the manifest weight of the evidence. Nor can either this court or the trial court substitute its judgment for the judgment of the Board. As we have stated, there was ample evidence in the record to support the findings of the Civil Service Board.

The plaintiff contends that in Drezner v. Civil Service Commission, 398 Ill. 219, the court held that where conduct constituting a crime is charged in a hearing before the Civil Service Commission, while the charge need only be proved by a preponderance of the evidence, evidence of guilt should be clear and convincing. Plaintiff contends that by that statement in its opinion the court intended to create a new burden of proof midway between proof beyond a reasonable doubt and proof by a preponderance of the evidence. A careful reading of the case, however, does not sus-

tain that contention. The decision of the court is based solely on the ground that the order of the Commission was against the manifest weight of the evidence, and the court in Harrison v. Civil Service Commission, 1 Ill.2d 137, referring to the Drezner case, takes the same view. In any case, the contention here would not help the plaintiff, because, giving the words "clear and convincing" their common and ordinary legal meaning, the evidence in the instant case also fulfills that requirement, if there is such a requirement.

The judgment of the Circuit Court is reversed and the decision and findings of the Civil Service Board are affirmed.

Judgment reversed.