Louis Pratico, Plaintiff-Appellant, v. Board of Fire and Police Commissioners of the City of Chicago Heights, Illinois, Defendant-Appellee.

Gen. No. 50,398.

First District, Fourth Division.

April 21, 1967.

Carbonaro & Carbonaro, of Chicago, for appellant.

L. Louis Karton, of Chicago, and Chris D. Gregory, Corporation Counsel, of Chicago Heights, for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

The plaintiff, Louis Pratico, was a detective patrolman of the department of police of the City of Chicago Heights, Illinois. He brought a suit under the Administrative Review Act to review an order of the Board of

Fire and Police Commissioners of the City of Chicago Heights, which had discharged the plaintiff without salary on the ground that he was guilty of conduct unbecoming a policeman, in a way to bring discredit to the department. The Circuit Court of Cook County affirmed the findings and decisions of the Board and entered judgment thereon. This appeal is taken from that judgment.

On January 31, 1963, Lester Klinger, a resident of Chicago Heights, found his apartment had been burglarized; that a television set and loose change had been taken. Later that day Klinger received a call from Marshall Field and Company advising that the credit cards of Klinger and his wife were being misused. He notified the police of Chicago Heights, and Captain Jarecki assigned Officer Louis Pratico to investigate the case. Pratico asked another officer, Frank Grupp, to help him; he instructed Grupp to go to the Klinger home and investigate the burglary while he, Pratico, went to Marshall Field and Company. Klinger had testified that when Grupp came to his home Klinger told him that on the day before the burglary two girls had come to his house to look at an apartment; that one of them said she couldn't rent it because the bank was closed, but that she would come back that night; that she returned later that night with a man whom Klinger subsequently identified from a photograph as Pratico. Klinger identified the girl as Donna Schmidt.

Grupp testified that he had asked Klinger to come down to sign complaints and warrants charging one Larry Shelton with burglary and forgery (misuse of Klinger's credit cards), along with Jane Doe warrants, setting out the same charge. He testified that Klinger signed the warrants, and that afterwards Captain Jarecki ordered Grupp to drop the investigation since Pratico had been assigned to it. Grupp stated that he gave the warrants to Pratico and told him that if Donna Schmidt was in-

volved he should bring her in. He further testified that Larry Shelton was subsequently arrested.

Police Chief Howard testified that he had had three conversations with Pratico about the Klinger burglary and that each time Officer Ziegenhorn from the State's Attorney's office was present; that in the first conversation on March 18 or 19, 1963, Ziegenhorn questioned Pratico about the burglary and the girl, Donna Schmidt; that Pratico stated he didn't remember if he knew the girl, and when shown a picture of the girl taken with himself and his brother, he said she looked familiar, and that he was not keeping company with her. Chief Howard further testified that Ziegenhorn had informed him he had information that Pratico had visited Donna Schmidt on several occasions at her home in Monee; that in some instances he went there in a squad car. Chief Howard stated that on March 26 Ziegenhorn asked him to have Pratico at the State's Attorney's office on March 27; that the order was issued and given to Grupp to deliver to Pratico; that Grupp reported that Pratico's wife said he was not at home; that on March 26, Chief Howard entered a suspension order effective March 27, against Pratico. Chief Howard further testified that the last time Pratico appeared for duty was on March 21, at which time he said he was going to consult a doctor; that the doctor had told Howard he had found Pratico's heart to be all right, but that he was emotionally upset and should rest for a few days. Chief Howard testified that Pratico's wife called in on the 23rd and said he would not be at work for a few days; that when Pratico was not found at home on the 26th, Howard entered the order of suspension, reasoning that if Pratico was well enough to leave his home he was well enough to report for duty.

Frank Ziegenhorn, a Chicago police officer attached to the State's Attorney's office, testified that he had first talked to Pratico on March 19, 1963, at which time Pratico

380

said he had taken a girl named Gina to Klinger's apartment as a favor to a friend. Ziegenhorn said he showed Pratico a photograph which Pratico said was a picture of himself and his brother and a girl who "looked familiar," but whom he did not know. Ziegenhorn stated that he again interviewed Pratico on March 20, when his partner and Chief Howard were present; that at that time Pratico's answers were evasive; that he didn't remember or didn't know. Ziegenhorn testified that he again interviewed Pratico on March 21; that Pratico said he did not remember where he met Gina; that he did not know a man named Victor Schmidt, and did not remember if he was in the home of Donna Jean Schmidt in Monee; that he did not recall having been in the company of the girl shown in the picture; that he would answer questions about himself but not about Donna Schmidt.

Betty Jean Jackson testified that she lived in Chicago Heights, was acquainted with Pratico and Donna Jean Schmidt; that the girl in the photograph was "Gina, . . . Donna Smith is what I was told was her name." She further testified that Donna and Pratico were at her home in February and on March 12 and 14.

Stanley Jarecki, a police captain, testified he had assigned Pratico to investigate the Klinger burglary; that the next day he asked Officer Grupp how he got into the case and was told that Pratico got him into it; that Captain Jarecki went to Pratico's home to serve papers on order of the chief, and found no one at home.

Carol Battenfield testified that she was the mother of Donna Schmidt; that she had become acquainted with Pratico a year ago when he came to see her daughter some two or three times a week; that her daughter had told her the picture in which she appeared with Pratico and his brother had been taken in the Brown Derby. She stated that Pratico picked Donna up sometimes in his own car and sometimes in a squad car; that he

usually brought her home around midnight, but there were times that Donna did not come in until morning.

David Battenfield testified that he was the brother of Donna Schmidt and had met Pratico about two years ago in his father's home where Pratico had come to take Donna on a date; that he saw Pratico in Monee at his mother's house on Easter Sunday in 1962; that his mother and father were in St. Louis for the weekend; that to the best of his knowledge Pratico and Donna stayed at his mother's home over that weekend.

Louis Pratico testified that he was married and lived with his wife and five children; that in the course of his work he had occasion to become acquainted with Donna Schmidt; that he saw her about two months prior to the Klinger burglary in connection with an investigation of an abortion case; that through her help five indictments were issued against the alleged abortionist; that the reason he did not talk about Donna Schmidt was that he did not want to divulge her name since she was an informer. He testified that he did cooperate with Officer Ziegenhorn and that he had said the girl in the photograph looked familiar, but that he could not be positive. He stated that he had met Donna Schmidt's mother once and had met her brother, David Battenfield, in Chicago Heights, but did not remember meeting him in Monee. He further testified that he went to the Klinger house with a girl named Gina, and was doing a friend a favor. He stated that when Miss Jackson testified that he was at her apartment with Donna Schmidt, she lied; that he never went to Miss Jackson's apartment with Donna Schmidt. He testified that it was not until after his suspension that he heard of the subpoena which was issued to him to appear before the grand jury; that his wife quarreled with him when she learned he had gone to an apartment with the girl; that he became depressed and left his home because he needed peace and quiet; that he did not report to the chief.

382

He further stated that when he went to Marshall Field and Company he was given a description of the girl who had presented Klinger's credit card, and said the description "could fit Donna Schmidt."

The Board of Fire and Police Commissioners on April 4, 1963, suspended Pratico for 30 days, pending investigation of the charges. On May 3, 1963, the Board made its findings and decisions which were that Pratico was guilty of conduct unbecoming an officer in ways that brought discredit to the department, in that he was absent from duty without permission, commencing on or about March 27, 1963; that he "failed to cooperate fully with the investigators of the Cook County State's Attorney's office in their investigation of the Lester Klinger burglary, all in direct violation of his superior's orders."

Pratico thereupon filed a petition for rehearing which was denied on May 29, 1963. On June 17, 1963, he filed a complaint in the Circuit Court under the Administrative Review Act, asking that the orders and decisions of the Board be reversed; that the said Board be directed to find Pratico not guilty of the charges, and that the Board be ordered to restore him to full duty with back pay. The Board filed an answer, incorporating the complete transcript of the proceedings sought to be reviewed, and on November 19, 1964, an order was entered in the Circuit Court determining that the findings and decisions of the Board of Fire and Police Commissioners were not contrary to the manifest weight of the evidence, were supported by substantial evidence in the record, and that they should be affirmed. From that order Pratico took this appeal.

In this court Pratico urged, among other things, that the charges were too vague and indefinite. This was the first time he had raised that defense, and he made no motion for a more specific statement of the charges, nor did he complain at the hearing that he was unable to prepare a defense. In McCaffery v. Civil Service Board

of Chicago Park Dist., 7 Ill App2d 164, 129 NE2d 257, the court approved a statement from People v. Chicago, 127 Ill App 118, where it was said:

"Petitioner made no objection to such charges. If they 'did not state facts sufficient in law to constitute an offense,' it was his duty then and there to object to them. Not having done so, it was afterwards too late for him to raise that question."

Also see Sudduth v. Board of Fire and Police Com'rs of City of Rockford, 48 Ill App2d 194, 198 NE2d 705.

■ In the opinion of this court, considering the fact that no action was heretofore taken by Pratico, the complaint was sufficient.

In Nolting v. Civil Service Commission of Chicago, 7 Ill App2d 147, 129 NE2d 236, the court, referring to all actions brought before a civil service commission to remove police officers, said:

"Discipline, as we have said, is vital or this force of armed men who protect the city can become a haven for bullies officially armed with guns or the instrument of corrupt forces looking for an opportunity to prey on the city's inhabitants. The Civil Service Act therefore must not be permitted to become a mantle for the corrupt and inefficient. If the court is to substitute its judgment for the judgment of the Civil Service Commission and of the Commissioner of Police as to disciplinary action that should be taken, it would in effect be substituting judicial discipline without responsibility for executive discipline with responsibility. The ultimate effect of such action would be a breaking down of the discipline and morale of the Police Department. Courts must accept the honest judgment of the Chief of Police and the Civil Service Commission, those arms of the executive department charged with administration of the police, with respect to

the proper discipline to be enforced when charges have been proved."

During the trial of the case and before Pratico testified, there was introduced on behalf of the complainant, over the objection of Pratico, Pratico's application to take an examination on May 20, 1954, for the position of police officer in the City of Chicago Heights. In that application Pratico was asked whether or not he had ever been convicted of or indicted for any crime; his answer was "no." The complainant also introduced at the same time, over Pratico's objection, record evidence of an indictment and conviction of Pratico of the crime of larceny in Cook County, together with an order dated October 17, 1951, of the criminal court admitting him to probation for a period of three years. From the record it appears that when Pratico made his application for the police examination he was still on probation, and his answers in the application were palpably false.

In his brief in this court Pratico argued that the introduction of such evidence was improper. If the evidence was improperly admitted the error would not be sufficient to require a reversal in this court.

In Schyman v. Department of Registration and Education of Illinois, 9 Ill App2d 504, 133 NE2d 551, a case in which a certified copy was introduced in evidence of a conviction of certain Kaadts in Indiana for prescribing medicine, which it was argued was similar to medicine sold by Schyman, the Appellate Court held that the conviction records were not sufficiently relevant for admission in evidence. The court said: "The admission of irrelevant evidence in administrative proceedings does not of itself require the reversal of the order of the administrative agency where there was independent probative evidence to support the order." The case cited and quoted from Sisto v. Civil Aeronautics Board, 179 F2d 47, where it was said: "The admission of irrelevant or incompetent matter before an adminis-

trative agency does not constitute reversible error, if there is substantial evidence in the record to sustain the agency's determination."

There appears to be no question in the record that Pratico went to the Klinger home in the company of Donna Schmidt; his relationship with her was fully brought out and was not of a character to put a halo on his head. He was evasive as to his contacts with Donna Schmidt, and it could definitely be inferred that his reason for sending Grupp to the Klinger home was that he did not want to be recognized by Klinger as the man who was with Donna Schmidt on the evening before the burglary. He testified that the reason he did not wish to identify her as the girl who went to Klinger's with him was that in another case some time before, she had acted for him as an informer. This could properly be considered as having no validity.

Pratico admitted in his evidence that he was absent from duty four or five days without permission, and the only reason given for his absence was that he quarreled with his wife about his relationship with Donna Schmidt.

Pratico complained of the conduct of John Cifelli, Secretary of the Board of Fire and Police Commissioners, and stated that Cifelli was an attorney and adviser to the Board. Cifelli did advise the Board during its hearing with reference to the propriety of certain questions and other matters, but there is no indication in the record as we read it that he went beyond his duty in giving such advice. In his brief in this court, Pratico referred to Cifelli as "Lord High Executioner"; considering the subsequent history of Officer Pratico, the reference must be interpreted as an unhappy one.

■■ Pratico in this court complained that he did not get a fair and impartial hearing. In our opinion, the hearing was fair and impartial. He also contended that the findings were against the manifest weight of the evidence. In civil service hearings the rule is that

the Circuit Court is authorized to set aside the findings of the administrative agency only if they are against the manifest weight of the evidence, and that this court has no greater right. See Sudduth v. Board of Fire and Police Com'rs of City of Rockford, 48 Ill App2d 194, 198 NE2d 705, and cases therein cited.

■ We find that the order of the Board and the decision of the Circuit Court are not contrary to the manifest weight of the evidence.

The case was argued in this court on June 22, 1966, and on August 30, 1966, Pratico was slain. On February 14, 1967, his attorney filed in this court a document suggesting the death of Pratico on August 30, 1966, further stating that Pratico left surviving his widow, Jane Pratico, and five children; that Jane Pratico was appointed administratrix of the estate of Pratico; that the present cause of action is the sole asset of his estate; that if the holding discharging Pratico were reversed, the estate might be entitled to moneys for loss of salary, damages, pension and other benefits. A motion was also made that Jane Pratico, administratrix of the estate of Louis Pratico, be substituted in the suit of the deceased against the Board of Fire and Police Commissioners. In 1 CJS Abatement and Revival § 128–b, it is said:

> "The death of a party pending appeal abates an action or proceeding which involves merely his personal status and is left with nothing to act on after its object has been accomplished by his death. . . . It is also true where the incumbent of a public office dies while an appeal is pending in a proceeding to remove him from office and he has not been suspended, so that there is no claim on the part of his representatives for loss of salary; but it is otherwise where there has been a judgment of ouster and a right to the emoluments of the office depends on the invalidity of that judgment. . . .

387

"The death of either party pending an appeal from a judgment in a divorce action abates the action so far as it affects the mere marital status, but not so far as property interests are involved, unless the questions pertaining thereto become moot."

In Danforth v. Danforth, 111 Ill 236, a divorce action, the argument was held and the case was submitted to the Supreme Court at the September term; on October 18, 1882, George Danforth died. The opinion was filed in the Supreme Court on March 28, 1883, and judgment was entered reversing the decree of the Circuit Court which had found in favor of George Danforth. In order to protect the rights of Danforth's widow the court entered an order amending the judgment to make it appear as of the September 1882 term.

In the case before us, had there been no claim on the part of Pratico's wife for loss of salary, the suit would have been dismissed; however, since this claim was made, we feel that the proper proceeding is to decide the case upon its merits. The case having been so decided it is proper for this court to file its opinion nunc pro tunc as of June 22, 1966, and it is so ordered.

The judgment of the Circuit Court is affirmed.

Affirmed.

ENGLISH, P. J. and DRUCKER, J., concur.