MICHAEL McCOY, Plaintiff-Appellant, v. JAMES KAMRADT *et al.*,
Defendants-Appellees.

First District (4th Division)   No. 84—1263

Opinion filed September 5, 1985.

George C. Pontikes, of Foss, Schuman & Drake, of Chicago, for appellant.

Norman E. Samelson, of Samelson, Knickerbocker & Erickson, of Des Plaines, for appellees Robert Sauer and Village of Hanover Park Police Department.

Peter A. Felice, of Lyons, for other appellees.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Michael McCoy, an officer in the village of Hanover Park police department (the department) was charged by the department with improper use of a firearm, substandard performance of duties and lack of maintenance of good physical/mental condition. Prior to the administrative hearing the plaintiff filed a motion requesting the defendants, James Kamradt, James Lewis and Robert Cover, the members of the board of fire and police commissioners (the board) to disqualify themselves from the instant hearing on the basis of their prejudice against the plaintiff. The board denied the motion. Following the hearing, the board discharged the plaintiff from his position as a police officer.

Upon administrative review, the circuit court affirmed the board's ruling with regard to the issue of prejudice but remanded the cause for the board's reconsideration regarding the sanction of discharge. The board was instructed to reconsider the discharge in light of two recent Illinois Supreme Court cases. (*Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101, 449 N.E.2d 115; *Kloss v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 252, 449 N.E.2d 845.) In its response to remand, the board distinguished *Walsh* and *Kloss* and affirmed the discharge. Subsequently, the circuit court also affirmed. The plaintiff now appeals contending that he was denied a fair and impartial hearing, that discharge was an inappropriate sanction, and that he was improperly suspended pending his hearing.

In making its findings, the board considered the plaintiff's conduct during the occurrence of five particular incidents and the medical testimony of five psychiatrists and psychologists.

The first incident occurred on April 8, 1980. As described by the plaintiff, on that day he answered a complaint regarding a boy that appeared to be beaten up followed by some other boys with rifles. When the plaintiff arrived at the scene, which were railroad tracks,

the boys fled. The plaintiff then returned to the complainant's house, which was adjacent to the tracks, in order to wait for the boys. Shortly thereafter, the plaintiff saw the boys on the tracks, waited until they were approximately 100 yards away, then exited the house with his gun drawn at a 30-degree angle from his body and pointed downward. He then yelled, "Drop those rifles" as he approached the boys. The complainant stated that he thought that the plaintiff did a good job. Further, a police instructor stated that the plaintiff used the proper police procedure regarding the use of a weapon given the circumstances as described by the plaintiff.

However, the department in presenting its case at the hearing, provided a somewhat different scenario of the incident. The department contended that when the plaintiff requested permission to investigate, he reported that "there were three kids down by the signal light, with a BB gun, a long arm of some type." Thus, it appears that the plaintiff was aware of the nature of the gun from the start. Further, the boys stated that when the plaintiff appeared from the house and approached them, he was running at them with his gun drawn and pointed directly at them yelling, "Stop, put up your hands and throw the BB guns down, the rifle down." It was also revealed that the plaintiff never filed a report regarding this incident.

The next two incidents involved DuComm, a control dispatch center that services the village of Hanover Park police department. Regarding the first occurrence with DuComm, on April 19, 1980, the plaintiff called in and requested that a matron be sent to the scene of an arrest in order to search a female shoplifter. The dispatcher then notified the plaintiff that no matron was currently available, to which the plaintiff responded that he never requested a matron and that he (the dispatcher) better get his act together or the plaintiff would file a complaint. Pursuant to established procedure, the dispatcher filed a report of the incident, the first such report the dispatcher had to file in his approximate three years of employment with DuComm.

As to the second incident involving a dispatcher, on May 15, 1980, the plaintiff was at home on his lunch hour when he received a call from the dispatcher regarding a fight in progress. The department's policy regarding lunch hours is that an officer is still on duty and is subject to assignment if the dispatcher deems it necessary. In this instance, the dispatcher felt it was a priority call, so he contacted both the plaintiff and a backup unit. In response to the call, the plaintiff asked if he could put his spoon down from his lunch break. The backup officer stated that when the plaintiff arrived at the scene, he was visibly disturbed with the dispatcher. The plaintiff then called the

dispatcher and proceeded to berate him for taking the plaintiff off his lunch break.

The fourth instance of alleged misconduct occurred on April 22, 1980, when the plaintiff attempted to serve an arrest warrant on George Tash for disorderly conduct. On that day, Jack Pavlo and a friend were sitting on Pavlo's back patio, which is surrounded by a 6-foot fence, when the plaintiff believing Pavlo's residence to be the one listed on the arrest warrant, yelled over the fence for George Tash. When Pavlo responded that he was not Tash nor knew of him, the plaintiff began to shake and bang the fence. The plaintiff yelled that he had a warrant and that he would use force to get in. A neighbor, hearing the plaintiff yell, came out of her patio and explained to the plaintiff that the person behind the fence was Jack Pavlo and that he had the wrong address. At no time did the plaintiff identify himself as a police officer.

The final incident involved a situation between the plaintiff and the plaintiff's supervisor, Sergeant Don Wood. A conflict between the two men began, when, following an inquiry of Wood by a mother of one of the boys in the BB gun incident of April 1980, Wood asked the plaintiff for his written report of that incident. The plaintiff refused to prepare one. In the following months, the plaintiff's performance diminished and Wood's evaluation of the plaintiff so reflected. During this period, while under Wood's supervision, the plaintiff, on four separate occasions, attempted to engage Wood in a physical confrontation. Also, the plaintiff was critical of Wood's performance regarding a situation where Wood, suspecting a suicide was being committed, did not enter the premise on the basis of believing that he had no legal authority to do so. The person inside later hanged himself. In that context, the plaintiff was heard to have said, "Sergeant Wood makes decisions that kill."

Also at the hearing, medical testimony was received regarding psychiatric and psychological examinations of the plaintiff. On April 10, 1980, Dr. Avrum Mendelsohn, a registered psychologist with 15 years of experience in police psychology, examined the plaintiff. Based on the examination, Dr. Mendelsohn opined that "[the plaintiff] has an exceptionally high potential to act in a negative, aggressive belligerent manner towards people." As to personality characteristics, Dr. Mendelsohn stated that there was an extremely high lack of temper control and that "if [the plaintiff] felt that another person was attacking his credibility or his authority, his position, he would have a high potential to physically act out, exceptionally high potential to verbally act out." He further stated that the plaintiff should not be allowed to

carry a firearm. In conclusion, Dr. Mendelsohn recommended that:

"For the welfare of the community [the plaintiff] not be placed in any situation where he is forced to come in contact with the general public and in addition, his contact with other village employees should be kept to a minimal level."

On May 29, 1980, Dr. Clifton Rhead, a certified psychiatrist and a member of the psychiatric board to the chief surgeon of the Chicago police department, examined the plaintiff. At the hearing, he testified that he found the plaintiff to be an individual with a "severe personality disorder, characterized by poor impulse control, defective judgment, poor relationships to authority and a tendency to repeat his psychological conflicts in his relations to his environment." Dr. Rhead concluded that "[t]hose characteristics make [the plaintiff's] ability to function effectively as a police officer questionable at best; it can be anticipated that the problems which have so far been encountered in his career will be repeated in future circumstances."

The plaintiff had three doctors testify on his behalf; Dr. Richard A. Malek, a certified psychiatrist; Dr. Ralph M. Mesenbrink, a clinical and consulting psychologist; and Dr. Robert C. Filice, a doctor engaged in the general practice of psychiatry. Dr. Malek testified that in his opinion, the plaintiff was not mentally ill. He did indicate that the plaintiff had some problems with impulse control and judgment but that the plaintiff was not dangerous to the safety and well being of the public and his fellow officers. Dr. Filice stated that the plaintiff did not suffer from any psychotic, neurotic or personality disorder and that the plaintiff "present[ed] no danger to himself, the men who worked with him, or to the community." Finally, Dr. Mesenbrink stated generally that no personality test which is scientifically valid can predict aggressive or future behavior.

Based on all the above factual testimony, the board concluded that the plaintiff had personality disorders and that he had violated the rules of regulation of the department and that these findings of facts were sufficient to justify the plaintiff's discharge as a police officer.

On appeal, the plaintiff contends that he was denied the right to a fair and impartial hearing before the board as prescribed by sec. 10–2.1–17 of the Illinois Municipal Code (Ill. Rev. Stat. 1983, ch. 24, par. 10–2.1–17). Specifically, the plaintiff alleges that the board was comprised of individuals who had exhibited ill-will towards him. This was illustrated by the plaintiff's and a friend of the plaintiff's affidavits wherein they stated that on one occasion, James Kamradt, one of the board members, told the plaintiff that even though a judge did not discharge him this time, that if Kamradt had the chance he would try

again to get the plaintiff discharged. This statement was strongly denied by Kamradt. The plaintiff also alleges that a lack of impartiality was demonstrated by the board's prior conduct wherein it ruled against the plaintiff on each and every charge that had been brought against him in the past.

Under the Illinois Municipal Code, the relevant section provides in pertinent part:

> "The board of fire and police commissioners shall conduct a fair and impartial hearing of the charges ***." (Ill. Rev. Stat. 1983, ch. 24, par. 10—2.1—17.)

The factors that provided the basis for a finding that a board is not impartial are not easily enumerated. Rather, it appears that the circumstances in each case establish whether a party is prejudiced when he appears before the board.

In the instant action, the plaintiff primarily cites *Mank v. Board of Fire & Police Commissioners* (1972), 7 Ill. App. 3d 478, 288 N.E.2d 49, and *Gigger v. Board of Fire & Police Commissioners* (1959), 23 Ill. App. 2d 433, 163 N.E.2d 541, as cases illustrative of a party's failure to receive an impartial hearing. In *Mank,* the court determined that the plaintiff did not receive an impartial hearing due to the fact that one of the board members was the father of the chief of police, who filed the charges against Mank. However, the court in *Gigger,* focusing on different considerations, stated that in order to be granted an impartial hearing it was imperative that a party be given the opportunity to be heard, the right to cross-examine adverse witnesses and the right to impartiality in rulings upon the evidence. (*Gigger v. Board of Fire & Police Commissioners* (1972), 23 Ill. App. 2d 433, 439.) In *Gigger,* an entire hearing was conducted by the board's attorneys so that the party being charged clearly did not receive a fair and impartial hearing.

The case at bar presents a totally dissimilar factual situation from the cases described above. Unlike those cases, there are no allegations of a close relationship between the board and any of the parties of interest, nor are there any allegations that the plaintiff was denied an opportunity to be heard or to cross-examine witnesses. Rather, the plaintiff's only allegations in support of his contentions of an unfair and partial hearing are the two affidavits describing a comment attributed to Kamradt, one of the board members, made three years prior to the hearing and prior adverse rulings in other disciplinary proceedings against the plaintiff.

■ The issue with regard to Kamradt's statement is a question of fact for the board to decide, since Kamradt's denial raises the ques-

tion of whether the statement was actually made. Thus, unless the board's decision is against the manifest weight of the evidence, this court will not disturb this ruling. The board's decision was not against the manifest weight. Moreover, a factor that militates against a finding of impartiality is that there is a total of three board members and the plaintiff only raised allegations of impartiality against one of those members, thus leaving a majority of the board impartial to decide the issue. Unlike those cases, there are no allegations of a close relationship between the board and any of the parties of interest, nor are there any allegations that the plaintiff was denied an opportunity to be heard or to cross-examine witnesses.

▆ As to the plaintiff's next allegation of prejudice, we cannot conclude that because a board has ruled adversely to a party in prior proceedings that they are necessarily lacking impartiality and should be disqualified. To reach such a conclusion would seriously affect all future hearings involving second-time offenders. Accordingly, we believe that the record does not support the plaintiff's contention that he did not receive a fair and impartial hearing.

▆ The plaintiff next contends that discharge was not an appropriate sanction since his alleged misconduct was due to emotional and psychological problems. The sanction of discharge is controlled by statute, which provides in pertinent part:

"[N]o officer or member of the fire or police department *** shall be removed or discharged except for cause, ***." (Ill. Rev. Stat. 1983, ch. 24, par. 10—2.1—17.)

The term "cause" has been judicially defined as:

" '[S]ome substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position.' " *Kreiser v. Police Board* (1977), 69 Ill. 2d 27, 30, 370 N.E.2d 511.

The plaintiff, however, argues that there is an exception to this standard. He asserts that a discharge sanction is unduly harsh and unwarranted when a police officer's inappropriate conduct is caused by a psychological or medically related problem. See *Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101, 449 N.E.2d 115; *Kloss v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 252, 449 N.E.2d 845.

The *Walsh* case involved a police officer who had been placed on medical disability suspension for a psychiatric problem. During the suspension and while drawing disability benefits from the pension

fund, the plaintiff, in a depressed state, contemplating suicide, pointed a gun at his wife and best friend and inadvertently shot his friend in the face. The plaintiff was then brought before the board on numerous violations. He was found guilty, and it was ordered that he be discharged. The appellate court reversed and remanded for consideration of an alternative sanction. The Illinois Supreme Court vacated the trial court's order and remanded because the psychiatric evidence presented was so vague and because the decision to discharge Walsh for cause may jeopardize his pension rights. The court concluded that on remand "[i]f the board finds that the misconduct was substantially related to [the psychiatric problems which led to his prior medical suspension], the proper sanction would be other than discharge for 'cause.'" *Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101, 108.

The plaintiff's contention primarily rests on the concluding language in *Walsh* quoted above. However, we do not believe the court meant to imply from that language that in every instance discharge is an inappropriate sanction where a party is subject to psychological evaluations and a relationship exists between his conduct and those evaluations. In *Walsh,* the court specifically found that the plaintiff was on medical suspension for a psychiatric problem. In the instant case, plaintiff's own expert witness testified that in his opinion the plaintiff was not mentally ill. The record does reflect however, that nearly all the expert witnesses found the plaintiff to have significant personality disorders. As was forcefully stated by Dr. Rhead, the plaintiff is an individual with a "severe personality disorder characterized by poor impulse control, defective judgment, poor relationships to authority and a tendency to repeat his psychological conflict in his relations to his environment *** and that these characteristics make the plaintiff's ability to function effectively as a police officer questionable at best."

In the case at bar, the plaintiff demonstrated a chronic pattern of misconduct. Further, the medical evidence presented provided that the plaintiff had personality disorders. These facts are not tantamount to discharging an officer as a result of a psychiatric problem, but rather represent the discharge of an officer that demonstrated an inability to exercise sound judgment and to control his emotions in situations police officers are expected to effectively confront. Furthermore, the case at bar is readily distinguishable from *Kloss. Kloss* involved a single isolated incident, whereas here, the plaintiff is charged with numerous departmental violations which occurred during a span of several months and which included no less than five sep-

arate incidents. Also, the plaintiff in *Kloss* was taking medication at the time of his violation, and the record in that case failed to include medical testimony regarding the relationship between the medication and the incident. In the instant case, the record does not indicate that the plaintiff was taking any particular type of medication. However, it is replete with expert testimony regarding the plaintiff's mental and emotional condition. Therefore, based on the above, *Kloss* does not mandate a finding that the plaintiff's discharge in the instant case was inappropriate. Accordingly, we do not believe the board acted unreasonably by discharging the plaintiff from his duties as a police officer.

■ The plaintiff's last contention is that he was improperly suspended from the department pending his hearing. The applicable statutory provision provides in pertinent part:

> "The board of fire and police commissioners shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof, which hearing may be continued from time to time. In case an officer or member is found guilty, the board may discharge him, or may suspend him not exceeding 30 days without pay. The board may suspend any officer or member pending the hearing with or without pay, but not to exceed 30 days. If the Board of Fire and Police Commissioners determines that the charges are not sustained, the officer or member shall be reimbursed for all wages withheld, if any." Ill. Rev. Stat. 1983, ch. 24, par. 10—2.1—17.

In the instant case, the plaintiff was suspended from the department from September 2, 1980, until January 21, 1981, the date he was formally discharged. Plaintiff argues that based on the statute, he is entitled to back pay from October 3, 1980, 30 days past the first day of suspension, until his discharge on January 21, 1981. This argument is without merit.

The same question regarding back pay was raised by a police officer in *People ex rel. Cotter v. Conlisk* (1974), 17 Ill. App. 3d 346, 308 N.E.2d 1. In *Cotter*, a Chicago police officer was indefinitely suspended pending a hearing in disposal of the charges against him. Ultimately, the officer was discharged, but he subsequently sought payment of his salary for the period beginning 30 days after his suspension and ending when he was notified of his discharge. The officer argued that under the controlling statutory provisions, he could not be suspended without pay for more than 30 days while waiting disposition of the charges against him. (See Ill. Rev. Stat. 1973, ch. 24, par. 10—1—18.1.) In deciding *Cotter*, the court found the police of-

ficer's interpretation incorrect and held:

> "Such an interpretation could not have been intended by the Legislature. To do so would require the police department to either continue someone on the job who is of doubtful character or competence, or suspend the man and continue paying him for not working. In the case of *Clark v. Morris* (1968), 99 Ill. App. 2d 24, 31, the court stated:
>
>> '*** it would be incongruous to conclude that the Legislature would provide a form of discipline which would propel this Court into conferring that which many individuals might deem a happy boon and a favor, i.e., pay without work. The status of being "without pay" is an incident of suspension.'
>
> Similarly, it would be incongruous in the instant case for a police officer under charges for taking advantage of his office to be paid while waiting to be officially discharged.
>
> The statute provides for procedural protection against arbitrary action by the Superintendent in the form of a hearing and review by the police board; it does not mandate the payment of a salary to one who is under charges with a recommendation of dismissal.
>
> If the police board finds the dismissal is unwarranted, then an officer is entitled to back pay because he was wrongfully deprived of his right to work. But one whose dismissal is affirmed by the police board can have no such claim." *People ex rel. Cotter v. Conlisk* (1974), 17 Ill. App. 3d 346, 347-48; see also *Haverly v. Boys* (1979), 77 Ill. App. 3d 312, 395 N.E.2d 1005.

We believe that the underlying logic and policy considerations that were expressed in *Cotter* are equally applicable to the instant statutory provision. It is inconceivable that the legislature would have intended any other conclusion.

Accordingly, based on the foregoing the judgment of the circuit court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.