RAYMOND KAPPEL, Petitioner-Appellee, v. POLICE BOARD OF THE CITY OF CHICAGO, Respondent-Appellant.—FRED RICE et al., Plaintiffs-Appellants, v. RAYMOND KAPPEL et al., Defendants-Appellees.

First District (5th Division)   No. 1—89—0975

Opinion filed September 30, 1991.

Kelly R. Welsh, Corporation Counsel, of Chicago (Ruth M. Muscovitch and Nina Puglia, Assistant Corporation Counsel, of counsel), for appellant.

William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:

In March 1985, defendant Police Board of the City of Chicago (the Board) discharged defendant Raymond Kappel, a Chicago police officer, for possession and sale of unregistered weapons. After a lengthy process of administrative review, in June 1987 the Board "with great reluctance" complied with a circuit court order by vacating the discharge and instead suspending Kappel for 3½ years, but only after the Board had resisted two prior remand orders to reduce the sanction. The procedural history is relatively complicated and is set forth in more detail below.

FACTS

On July 30, 1984, the superintendent of police suspended Kappel and filed charges against Kappel with the Board. On December 21, 1984, the date set for hearing, amended charges were filed. He was charged with violation of several rules and regulations of the police department, including:

> "Rule 2. Any action or conduct which impedes the department's efforts to achieve its policy and goals or brings discredit upon the department.
>
> Rule 6. Disobedience of an order or directive, whether written or oral."

The basis of these charges, each pertaining to Kappel's conduct during the spring of 1981, included: (1) possession of an unregistered automatic rifle; (2) possession of an unregistered semi-automatic rifle; (3) selling a handgun from which the serial number had been removed; (4) firing a gun within the city limits; and (5) lying regarding his knowledge of the rifle being automatic.

A two-day hearing took place on December 21, 1984, and January 9, 1985. The parties entered into stipulations regarding certain facts,

including the following: On April 16, 1981, Kappel sold a .25 caliber Berretta automatic handgun without a serial number on it to a Federal undercover agent. On May 13, 1981, at 1 a.m., he discharged an automatic rifle at I-55 and Pulaski, which is within the corporate limits of the City of Chicago. On May 15, 1981, Kappel was in possession of an AR-15 rifle (serial No. 133842) which had been converted to a fully automatic weapon, and was also in possession of an AR-15 semiautomatic rifle (serial No. 46995).

Morris Steward, of the Internal Affairs Division (IAD) of the Chicago police department, testified for the department. He believed the department received "federal documents" regarding Kappel in late 1983 or early 1984, which triggered an IAD investigation. To Steward's knowledge, Kappel later cooperated with State and Federal authorities. The Federal government granted Kappel immunity from prosecution.

Francisco Guerrero, a Chicago police officer, testified for the Department that he sold a semi-automatic rifle (serial No. 46995) to Kappel three or four years earlier (which would have been 1980 or 1981).

Michael Van Amburgh testified for the department that he is a special investigator, criminal, for the United States Treasury Department, Department of Alcohol, Tobacco and Firearms (ATF). In June 1980, he was assigned to investigate Chicago police officer Michael Gallagher. Van Amburgh testified that the Gallagher investigation began "[d]ue to allegations that Michael Gallagher was a federal firearms dealer [who] was illegally obtaining and selling firearms." Federal charges were subsequently brought against Gallagher through a government information and Gallagher pleaded guilty and was imprisoned as a result of that plea.

Kappel himself was not under investigation when Gallagher introduced Van Amburgh to Kappel. On April 1, 1981, Kappel telephoned Van Amburgh and identified himself as "Ray." Van Amburgh testified that "Ray told me that he understood I was interested in purchasing a .25 *** caliber Berretta, that I had previously spoken to Michael Gallagher about." Kappel also remarked that "he was not crazy about talking over the phone because he did not know who he was talking to. He felt that he had phone problems." They agreed on a price of $100 for the handgun.

On April 16, 1981, at 10:30 p.m., Van Amburgh met at a restaurant parking lot with Kappel, Gallagher and an unidentified Chicago police officer. Gallagher produced the .25 caliber Berretta and handed it to Van Amburgh. There was evidence indicating that the serial number had been removed. Van Amburgh testified further that he

"turned to [Kappel] and asked him if we still agreed upon the price of $100. He said, 'Yes, that's right,' at which time I gave him $100."

Several weeks later, Van Amburgh arranged to meet Kappel at a restaurant in the company of Gallagher and his nephew. They discussed "different types of weapons." Kappel told Van Amburgh "as we were talking about different rifles [he said] that he did possess an AR-15 rifle that *** was converted."

On May 12, 1981, Van Amburgh and Reggie Humphries, a friend of Kappel, were at Kappel's home with Kappel. Two women were also in and out of the house. Kappel showed Van Amburgh a converted AR-15 rifle. Van Amburgh performed a standard field test and determined it could fire in a fully automatic mode. Kappel, Humphries and Van Amburgh later went to a restaurant, then drove to I-55 and Pulaski at about 12:15 a.m. Kappel "produced an AR-15 rifle along with ammunition," and Van Amburgh produced a 9 millimeter machine gun. They took turns firing the weapons into the water and into the land next to the water. The only people in the vicinity were several ATF agents.

On May 15, 1981, Van Amburgh, along with several other ATF agents and Sergeant Morris Steward of the Chicago police department, executed a search warrant at Kappel's apartment. They found an AR-15 rifle (serial No. 133842) which was fully automatic, and a second AR-15 rifle (serial No. 46995) which was semi-automatic.

Kappel, in exchange for a promise of immunity, then cooperated with ATF in the investigation of Gallagher. Kappel also cooperated subsequently in a second investigation in which he wore an electronic surveillance device.

On cross-examination, Van Amburgh agreed that he told Kappel he was a good police officer, and that he felt Kappel had been "caught up in a bad situation because he was a gun buff."

Captain Matthias Casey testified for petitioner that he worked with Kappel for eight years as his watch commander. Kappel's quality of work was excellent, and he was an asset to the police department. On cross-examination Casey testified that the stipulated facts did not change his opinion as to Kappel's "capacity as I know him as a police officer."

Sergeant Jesse Acosta testified for Kappel that he worked with Kappel for 4½ years as his immediate supervisor. Kappel had a very good reputation as a police officer. The stipulated facts did not change his opinion. "[H]e's still a good officer as far as I'm concerned."

Sergeant Charles Hensley testified for Kappel that he worked with Kappel for seven years as his immediate supervisor. His perform-

ance, efficiency ratings and reputation were good. He considered Kappel "absolutely" to be an asset to the police department. Hensley specified that he was Kappel's immediate supervisor in April and May of 1981 and noticed nothing unusual or problematic about Kappel's performance as a police officer during that time. On cross-examination, Hensley testified that the stipulated facts did not change his opinion of Kappel.

Kappel testified on his own behalf that he became a police officer on October 25, 1971. From 1971 to 1985, he received approximately 115 honorable mentions and one department commendation. He was never told that his performance during this period was substandard or insufficient. He had never been disciplined. His average efficiency grades were 85% to 90%. From May 15, 1981, to July 30, 1984, he received one department commendation and 20 to 30 honorable mentions.

In 1978, Kappel and his wife were divorced. In 1979, his father committed suicide. In 1981, his mother died. During this period, Kappel began to drink. In late 1981, he sought help through the police department and entered the alcoholism treatment program recommended by the police department. He was hospitalized for the minimum time—seven days—and then released by attending physicians. "They felt that I was capable at that time. I wasn't a confirmed alcoholic and I went to almost a year of AA meetings." He stated that he experienced no problems with alcohol after December 1981. On cross-examination, Kappel agreed that between 1978 and 1981 he drank excessively.

Kappel testified that on April 16, 1981, at 10:30 p.m., he sold a .25 caliber Berretta automatic handgun to Van Amburgh. They met in the parking lot of a restaurant. Gallagher had possession of the gun and handed it to Van Amburgh. The gun had no serial number and Kappel had no permit to sell the gun.

On May 13, 1981, at 1:30 a.m., Kappel fired an AR-15 fully automatic rifle at I-55 and Pulaski while Van Amburgh was present. Kappel described the vicinity of I-55 and Pulaski as private land owned by the City of Chicago Sanitary District, covering an area of one-half by three miles located along the canal. It was a "desolate" area which was unoccupied. "It's mainly used as a road from Pulaski up into Cicero where the City stores piping and sewage [sic]."

Kappel testified that on May 15, 1981, a search warrant was executed and two AR-15 rifles were found in his apartment. Kappel agreed that he had bought one (serial No. 133482) rifle "from the gun dealer, Michael Gallagher." He did not register it. It was not fully au-

tomatic when he purchased it. However, he conceded that it could be converted to a fully automatic weapon with the addition of a part which he possessed. Kappel purchased the second rifle (serial No. 46995) from Chicago police officer Guerrero.

Kappel testified further that he cooperated with ATF agent Van Amburgh in the investigation of Gallagher, and in one additional investigation (not further identified in the record), during which he wore a recording device. Kappel felt his life was in danger during the period he performed this undercover work.

In closing arguments before the Board, counsel for the police Department argued that "the Police Board should take note of the context of these actions. We must not forget that Kappel had close association with Michael Gallagher." Counsel for Kappel responded that Kappel was simply "caught up in an investigation of Michael Gallagher," who pleaded guilty only because of Kappel's cooperation in the investigation and "that is the crux of this entire case."

PROCEDURAL HISTORY

In March 1985 the Board found Kappel guilty of all charges and found cause for discharge. Kappel filed a petition for administrative review in the circuit court. In November 1985, the circuit court reversed the Board's decision and remanded for reconsideration of the penalty after finding the penalty of discharge was "against the manifest weight of the evidence."

In January 1986, the Board again decided that Kappel should be discharged. Kappel again petitioned for administrative review. The circuit court, for the second time, remanded to the Board with directions that it "impose a penalty lesser than that of discharge."

In June 1986, the Board reaffirmed its decision to discharge Kappel for the third time. The Board then asked the circuit court for an "entry of final judgment" to render the matter appealable, and to end the remand process. The Board stated: "That the interests of justice and of administrative and judicial economy will not be best served by further remand ***." On June 17, 1986, notwithstanding the Board's motion for entry of a final order, the trial court again entered an order remanding the matter to the Board and stating that "in accordance with the order entered herein on May 9, 1986, the Board *** is ordered to impose an alternative penalty lesser than that of discharge." Notwithstanding this circuit court order, the Board continued with the appeal process in this court.

On May 1, 1987, this court, in an unpublished Rule 23 order (Nos. 86—1516, 86—2109 (cons.)) dismissed the Board's appeal for lack of

jurisdiction because the June 17, 1986, trial court remand order was not a final and appealable order.

On June 10, 1987, the Board reconsidered its decision pursuant to the June 17, 1986, trial court order, and on July 9, 1987, it issued the following findings and decision.

"It is the opinion of the Police Board that [Kappel] should be separated and discharged from the Chicago Police Department. The several offenses for which he stands convicted properly preclude his continued service. However, in obedience to the order of Judge George Higgins, and in order to facilitate an appeal against that order should this be thought appropriate, the Police Board with great reluctance orders a punishment less than separation."

The Board then ordered that Kappel be suspended "from July 30, 1984 to and including January 29, 1988."

On August 11, 1987, the superintendent (Rice) filed a petition for administrative review of the July 9, 1987, order of the Board in the circuit court naming the Board and Kappel as defendants.

On September 2, 1988, Judge Robert L. Sklodowski entered an order which (1) joined Leroy Martin, superintendent of police, as a party plaintiff; (2) reversed the July 9, 1987, findings and decision of the Board "insofar as the suspension of [Kappel] was therein ordered"; and (3) remanded to the Board for an entry of a decision "ordering the discharge of Raymond Kappel from employment." The record does not show any reasons given by the court. (The order was made *nunc pro tunc* effective August 9, 1988.)

On September 8, 1988, Kappel filed a motion for reconsideration, which the court granted.

On December 5, 1988, Judge Sklodowski entered an order which: (1) vacated the August 9, 1988 (Sept. 2, 1988) order; and (2) remanded to the Board "with directions to impose a sanction less than discharge against Kappel." Again, the record does not show any reasons given by the court as a basis for its decision.

On December 22, 1988, plaintiffs (Rice and Martin) filed a motion for "entry of final judgment," arguing that the remand order was unnecessarily duplicative because a penalty less than discharge had already been imposed, and Kappel had never challenged that decision of the Board.

On March 15, 1989, the court granted plaintiffs' "motion for entry of final judgment" and entered an order which: (1) "affirmed and deemed final" the Board's July 9, 1987, suspension order; (2) vacated the December 5, 1988, trial court order remanding to the Board; and

(3) found no just reason or cause for the delay of appeal from the order.

On April 11, 1989, plaintiff (Rice) filed a notice of appeal from the March 15, 1989, order affirming the Board's suspension of Kappel. The notice of appeal states: "By this appeal, the respondent [police superintendent] will ask the Appellate Court to reverse the decision of the circuit court and reinstate Raymond Kappel's discharge."

OPINION

The police superintendent contends that the circuit court erred in overturning Kappel's discharge because the Board's decision to discharge Kappel was not arbitrary, unreasonable or unrelated to the needs of the Chicago police department. He asks that we reverse the circuit court decision and reinstate the Board's original decision discharging Kappel.

Kappel counters that the Board's discharge was arbitrary, unreasonable and did not serve the purposes of the police department, because Kappel's misconduct in 1981 was "a brief, unfortunate episode in an otherwise exemplary career," and because he has "atone[d] for his mistakes" since that time. Kappel argues in his brief that he "established his abilities as a policeman over a ten year period before becoming enmeshed in the federal investigation of Michael Gallagher." (Kappel does not argue that suspension is improper, and in fact asked the circuit court to affirm the 3½-year suspension.)

The scope of review of an administrative agency's decision regarding discharge requires a two-step analysis. (*Kloss v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 252, 449 N.E.2d 845; *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n* (1981), 85 Ill. 2d 547, 426 N.E.2d 885.) First, the court must determine if the agency's findings of fact are contrary to the manifest weight of the evidence. (*Kloss v. Board of Fire & Police Commissioners*, 96 Ill. 2d 252, 449 N.E.2d 845; *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 426 N.E.2d 885.) In applying this rule of law, the findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct. Ill. Rev. Stat. 1989, ch. 110, par. 3—110.

The second step in the court's analysis is to determine if the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist. *Kloss v. Board of Fire & Police Commissioners*, 96 Ill. 2d 252, 449 N.E.2d 845; *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*;

*Carrigan v. Board of Fire & Police Commissioners* (1984), 121 Ill. App. 3d 303, 459 N.E.2d 659.

In the present case, we are not concerned with the first prong of the test, *i.e.*, whether the manifest weight of the evidence supported the factual findings of the Board. Kappel does not contend that the factual findings of the Board are against the manifest weight of the evidence. Indeed, those findings are predicated largely upon the facts which have been stipulated to by the parties.

■ Unlike the first step of the analysis, in the second step, the agency's findings as to whether Kappel's misconduct provided cause for discharge are not subject to a manifest weight of the evidence test. (See *Jenkins v. Universities Civil Service Merit Board* (1982), 106 Ill. App. 3d 215, 435 N.E.2d 804, citing *Fox v. Civil Service Comm'n* (1978), 66 Ill. App. 3d 381, 383 N.E.2d 1201.) The proper standard of review for the second prong is: "[T]he agency's decision as to cause will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service." (*Department of Mental Health*, 85 Ill. 2d at 552; *Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 252, 449 N.E.2d 845.) The trial court and the appellate court are bound by the same standard of review. *Blunier v. Board of Fire & Police Commissioners* (1989), 190 Ill. App. 3d 92, 107, 545 N.E.2d 1363.

■ A police officer may not be discharged without "cause." (Ill. Rev. Stat. 1985, ch. 24, par. 10—1—18(a).) "Cause" for discharge has been judicially defined as "some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position." *Department of Mental Health*, 85 Ill. 2d at 551; *Rispoli v. Police Board* (1989), 188 Ill. App. 3d 622, 549 N.E.2d 1063; *O'Malley v. Board of Fire & Police Commissioners* (1989), 182 Ill. App. 3d 1019, 538 N.E.2d 888; *Kvidera v. Board of Fire & Police Commissioners* (1989), 192 Ill. App. 3d 950, 549 N.E.2d 747; *Glenville v. Police Board* (1988), 177 Ill. App. 3d 583, 532 N.E.2d 490; *Allman v. Police Board* (1986), 140 Ill. App. 3d 1038, 489 N.E.2d 929; *Carrigan v. Board of Fire & Police Commissioners*, 121 Ill. App. 3d 303, 459 N.E.2d 804; *Jenkins v. Universities Civil Services Merit Board*, 106 Ill. App. 3d 215, 435 N.E.2d 804; *Nolting v. Civil Service Comm'n* (1955), 7 Ill. App. 2d 147, 129 N.E.2d 236.

■ An administrative tribunal's finding of cause for discharge commands respect (*Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d at 105, 449 N.E.2d 115; *Carrigan v. Board of Fire & Police*

*Commissioners*, 121 Ill. App. 3d 303, 459 N.E.2d 659) and "substantial" or "considerable deference" (*Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d at 106; *Blunier v. Board of Fire & Police Commissioners*, 190 Ill. App. 3d at 107). The Board has "considerable latitude" (*Rispoli v. Police Board* (1989), 188 Ill. App. 3d at 638) and "considerable discretion" (*Kvidera v. Board of Fire & Police Commissioners*, 192 Ill. App. 3d at 950) in determining what constitutes cause for discharge.

The Board's decision will stand even if the court were to consider another sanction more appropriate. (*Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d at 106; *Kvidera v. Board of Fire & Police Commissioners*, 192 Ill. App. 3d 950, 549 N.E.2d 47; *Carrigan v. Board of Fire & Police Commissioners*, 121 Ill. App. 3d 303, 459 N.E.2d 659.) The court cannot sit as a supercommission in reviewing the punishment imposed. (*Nolting v. Civil Service Comm'n*, 7 Ill. App. 2d at 153.) It is the Board, rather than the court, which is best able to determine the effect of the officer's conduct on the proper operation of the department. (*Jones v. Civil Service Comm'n* (1979), 80 Ill. App. 3d 74, 76, 399 N.E.2d 256.) The wisdom, necessity or propriety of any action regarding the administration of a police force is within the province of the municipality. *Braje v. Board of Fire and Police Commissioners* (1985), 139 Ill. App. 3d 90, 487 N.E.2d 91.

We note that the Board did not articulate a full rationale underlying its disciplinary decisions, although it would be helpful to the reviewing courts. Nevertheless, we must review the record "in light of the conduct meant to be penalized by [the] rule" which Kappel was found guilty of violating (*Harrison v. Civil Service Comm'n* (1953), 1 Ill. 2d 137, 149, 115 N.E.2d 521) and determine whether a reasonable and nonarbitrary rationale relating to the needs of the service supports the sanction of discharge.

Kappel was found guilty of violating Rule 2 of the police department. That rule prohibits "[a]ny action or conduct which impedes the department's efforts to achieve its policy and goals or brings discredit upon the department." The department's underlying policy and goals require it to protect the lives and property of the public by enforcing the criminal code and city ordinances. (*Davenport v. Board of Fire & Police Commissioners* (1972), 2 Ill. App. 3d 864, 869, 278 N.E.2d 212.) This task requires the police department to surmount many difficulties because of the numerous problems confronting a large metropolitan city police force. *Davenport v. Board of Fire & Police Commissioners*, 2 Ill. App. 3d at 869; *Nolting v. Civil Service Comm'n*, 7

Ill. App. 2d at 160 (many enforcement difficulties confront police departments in large metropolitan area).

Thus, in order to accomplish the task, the "discipline and efficiency" of the department referred to above in the definition of "cause" are "not only vital but absolutely essential." (*Davenport v. Board of Fire & Police Commissioners*, 2 Ill. App. 3d at 869.) Discipline enables the department, which "in many respects resembles a military force in that there is the same necessity of discipline" (*DeGrazio v. Civil Service Comm'n* (1964), 31 Ill. 2d 482, 488, 202 N.E.2d 522; *Harrison v. Civil Service Comm'n*, 1 Ill. 2d at 153; *Nolting v. Civil Service Comm'n*, 7 Ill. App. 2d at 160), to "be staffed with well trained and organized personnel" and ensure the "proper functioning of the department" (*Harrison v. Civil Service Comm'n*, 1 Ill. 2d at 153).

In addition, discipline is "vital *** not only for the members of the department, but [also] in order to maintain the respect of the public, without which the department would become incompetent and demoralized." (*DeGrazio v. Civil Service Comm'n*, 31 Ill. 2d at 488, citing *Nolting v. Civil Service Comm'n*, 7 Ill. App. 2d at 160. See also *Davenport*, 2 Ill. App. 3d at 869-70 ("if discipline were absent, the Department would lose the respect of the public and should this occur the department would become incompetent and demoralized").) Thus, "the discharge of a police officer for conduct unbecoming to the department is not only for the purpose of punishing the officer, but for the protection of the public," which must maintain respect for the department. *DeGrazio v. Civil Service Comm'n*, 31 Ill. 2d at 488; *Harrison v. Civil Service Comm'n*, 1 Ill. 2d at 153.

The essence of the misconduct for which Kappel was found guilty focuses directly upon Kappel's failure to respect the law which the public trusts Kappel to enforce for its protection. "It is apparent that a police officer who does not abide by the laws that he has a duty to enforce will impair the discipline and efficiency of the police force." (*Jones v. Civil Service Commission*, 80 Ill. App. 3d at 76; *Sheehan v. Board of Fire & Police Commissioners* (1987), 158 Ill. App. 3d 275, 290, 509 N.E.2d 467 (discharge upheld; officer must obey laws he is sworn to uphold).) Kappel was found guilty of possession and sale of an unregistered handgun, with the serial number removed, to a stranger referred to him by fellow officer Gallagher, a "federal firearms dealer"; possession of an unregistered, automatic rifle sold to him by Gallagher; and possession of an unregistered, semi-automatic rifle sold to him by fellow officer Guerrero. The Board could reason that this conduct evidenced a disrespect for the law.

Courts have upheld the discharge of police officers for offenses similar in nature to the offenses here, where the misconduct manifested a disrespect for the law and tended to bring discredit upon the department. See, *e.g., DeGrazio v. Civil Service Comm'n*, 31 Ill. 2d at 489 (discharge of Chicago police lieutenant upheld; court found "[i]t does not require an expert opinion to establish that" the officer "brought ridicule to the department" when he went to Europe with a man whose "reputation was bad" and who had been seen "meeting with known criminals and hoodlums at a certain bar and restaurant" and who had invited "notorious criminals" to parties at his home, accounts of which parties were published in Chicago newspapers); *Rispoli v. Police Board*, 188 Ill. App. 3d at 638 (discharge upheld where officer showed disrespect for the law by selling used parts from stolen cars recovered by the police to his own car repair business; conduct was "neither trivial nor unrelated to what the public has a right to expect from a police officer"); *Sheehan v. Board of Fire & Police Commissioners*, 158 Ill. App. 3d at 290 (discharge upheld where officer failed to "abide by the laws which he has a duty to enforce" and was found to have "committed the criminal offenses of theft and attempted theft" (158 Ill. App. 3d at 279) and showed a "continuous pattern and practice of deception of off-duty employers" (158 Ill. App. 3d at 290) and acted in a way unbecoming to an officer when he repeatedly falsely represented that he was working as a security guard for two different employers at two different places at the same time and was being paid on both payrolls); *Davenport*, 2 Ill. App. 3d at 869 (discharge upheld where officer attempted "to take the law into his own hands" by knocking down and hitting an individual with whom he was arguing).

Even if Kappel's sale of the $100 handgun were not considered, possession alone of the handgun, along with the two rifles, exacerbated by the unlawful firing of an unregistered automatic weapon, would constitute a lack of respect for the law particularly inappropriate in a police officer, which undermines public confidence in the judgment and intelligence of law enforcement officers. *Allman v. Police Board* (1986), 140 Ill. App. 3d 1038, 489 N.E.2d 929 (unregistered firearm used by officer). See also *Glenville v. Police Board*, 177 Ill. App. 3d at 586.

By selling the unregistered handgun, in addition to manifesting a general disrespect for the law and undermining the public's confidence in the judgment of law enforcement officers, Kappel committed an act which could potentially endanger members of the public. He placed an illegal weapon in the hands of unknown persons. It would

therefore not be arbitrary or unreasonable for the Board to find cause to discharge Kappel particularly if one considers the impact on members of the public who might discover that a weapon subsequently used in an armed robbery or murder was purchased from a police officer.

Police officers, more than other public servants, must exhibit and maintain respect for the dangerous nature of weapons generally. (See, *e.g., Jenkins v. Universities Civil Service Merit Board*, 106 Ill. App. 3d 215, 435 N.E.2d 804 (respect for weapons is paramount to efficient and disciplined police department; harm that may result from misuse of a gun, intended or accidental, is great); *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d at 106 (court found that "[n]othing can undermine public confidence in the ability and good judgment of police officers more than the misuse of firearms"); *Carrigan v. Board of Fire & Police Commissioners*, 121 Ill. App. 3d 303, 459 N.E.2d 659 (officer properly discharged where he misused his gun; respect for weapons is paramount to an efficient and disciplined police department); *Ritenour v. Police Board* (1977), 53 Ill. App. 3d 877, 369 N.E.2d 135 (officer properly discharged where he fired gun at a street lamp in an alley).) The sale of guns, unlike a single incident of weapons misuse, as in the case of an officer's improperly drawing a service revolver while intoxicated, has a continuing effect because the unregistered, illegally possessed gun has been placed in circulation and it will continue to be used, most probably for criminal purposes.

An additional factor the Board was free to consider was the fact that such public confidence would be further undermined by Kappel's having spoken about and showed the handgun and rifles either directly to, or in the presence of, other people including Van Amburgh, two women who were at Kappel's home, Guerrero, Reggie Humphries, an unidentified officer, Gallagher's nephew, and Gallagher himself. See *Kvidera v. Board of Fire & Police Commissioners*, 192 Ill. App. 3d at 965 (discharge upheld; conduct affected members of community and thus could undermine public confidence in police department and impede its efforts to maintain honesty and integrity).

This was not a chance meeting between two gun collectors. Kappel permitted Gallagher to put him into contact with Van Amburgh, a potential customer. The Board was aware that Kappel was cognizant enough of the illegal nature of his activities that, after telephoning Van Amburgh at Gallagher's suggestion, Kappel expressed concern about talking with Van Amburgh on the telephone because "he did not know who he was talking to [ ] [and] [h]e felt that he had phone problems." Kappel advanced his relationship with Van Amburgh sev-

eral weeks after the sale of the handgun, by again arranging to meet at a parking lot, where they discussed "different types of weapons." While there is no evidence that Kappel offered the automatic rifle to Van Amburgh for sale, the Board was aware that the men arranged to meet a third time at a parking lot, and this time Kappel brought an automatic rifle and ammunition, and after midnight they drove to the canal to fire the gun for some unknown purpose—presumably either to test the weapon for a potential sale, or for recreation. All of this conduct evidences a more flagrant disregard for the law than simply, e.g., a "gun buff" maintaining a private collection in his home.

The Board could also note that Kappel's conduct described above persisted over a period of time necessary to accumulate the guns in question and negotiate the sale with Van Amburgh and make arrangements to meet with Van Amburgh several times. This was not a single, impulsive act. It required time, planning, telephone calls, meetings, initiative and preparation.

In addition to focusing directly upon public safety and public confidence, the Board could also legitimately focus on the effect which its sanction of Kappel may have on the other officers in the department. The Board might properly find that discharge would have a greater deterrent effect on other officers in the department than suspension and thereby would enhance the protection of the public. The Board is in the best position to determine the impact of one officer's discharge upon other officers and whether it would deter them from taking advantage of the many illicit opportunities generally available to police officers. (See *Nolting v. Civil Service Comm'n*, 7 Ill. App. 2d 147, 129 N.E.2d 236.) This concern about the impact on the discipline and morale of fellow officers is especially relevant where at least three other police officers and several members of the public were aware either of Kappel's illegal possession of guns or of the gun-related contacts between Van Amburgh and Kappel.

Kappel argues that he never directly threatened violence to another person, as borne out by the fact that the department let him "carr[y] a gun as part of his duties as a Chicago Police Officer for three years *after* the events of April and May, 1981." The crux of Kappel's misconduct, while it could be broadly characterized as the "misuse of weapons" in that he sold and possessed illegal weapons, differed considerably from the typical impulsive misuse of service weapons evidenced in the following cases. See, *e.g.*, *Walsh v. Board of Fire and Police Commissioners*, 96 Ill. 2d 101, 449 N.E.2d 115 (officer must show considerable care in handling and using his service revolver because he has access to the weapon every day of his career;

officer in *Walsh* intentionally discharged his gun at the floor in a close proximity to his wife and a friend, and then accidentally fired the gun into his friend's face); *McCoy v. Kamradt* (1985), 136 Ill. App. 3d 551, 483 N.E.2d 544 (officer draws gun and points at boys with BB gun); *Carrigan v. Board of Fire & Police Commissioners*, 121 Ill. App. 3d 303, 459 N.E.2d 659 (officer becomes enraged with wife, draws gun and shoots toilet after wife throws marijuana into toilet; failed to recognize possibility of ricochet with wife standing a few feet from toilet); *Kloss v. Board of Fire & Police Commissioners*, 96 Ill. 2d 252, 449 N.E.2d 845 (officer threatens suicide, holding arm of his daughter while drawing gun and threatening other officers); *Jenkins v. Universities Civil Service Merit Board*, 106 Ill. App. 3d 215, 435 N.E.2d 804 (when officer was stopped for drinking while driving State vehicle, he threatened other police officers with his gun).

This is clearly not such a case. Here, Kappel exhibited neither impulsive nor emotionally charged behavior. Instead, any "misuse of weapons" in this case was the product of deliberate, calculated dealings and in the presence of members of the public and other officers, involving the possession of a semi-automatic and an automatic rifle, and the sale of an automatic handgun.

Kappel nevertheless argues the inconsistency of the Board's seeking to remove him from the department when it permitted him to wear a badge for three years after the department was aware of his misconduct in 1981. The delay in time, however, is not by itself a dispositive factor here. Under normal circumstances, without the pendency of this action and supervision during the 3½ years of undercover work, Kappel would not have had that opportunity. It does not contradict the Board's conclusion that there was a need to discharge Kappel in order to punish Kappel; to effectively deter similar acts of misconduct by other officers; and to maintain the public's confidence in the department. Moreover, while the department or the Board may very well have trusted Kappel to perform his undercover duties under Federal and State supervision, it does not dispel the possibility of future misconduct in ordinary police activities without such supervision.

Kappel argues further that the discharge is unreasonable because of his drinking problems and "unrelenting emotional upheaval" due to his divorce, his father's suicide and his mother's death. The evidence, however, does not show that Kappel's misconduct was caused by any mental or emotional disorder, whether temporary or otherwise. (*Cf., e.g., Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 449 N.E.2d 115 (court remanded for more medical evidence where record indicated misconduct of officer was probably result of psycho-

logical problems for which he was on disability suspension at the time the misconduct occurred).) There was no evidence that Kappel's alcoholism led him to engage in the business of selling illegal weapons. He presented no expert testimony regarding any causal connection between his drinking problems or for that matter any psychological or emotional disorders, and his misconduct. (See *Glenville v. Police Board*, 177 Ill. App. 3d at 587 (no evidence that calculated plan to steal was caused by alcoholism; unlike *Walsh*, no evidence which would prompt the court to look for further details of his alcoholism).) In addition, we note that Kappel himself testified that he "wasn't a confirmed alcoholic." Three of his superiors testified that Kappel's performance on the job was excellent, and Hensley specified that there was no change in Kappel's performance during April and May of 1981. In his brief, Kappel admits that his "job performance remained unaffected" by the drinking, and it only "clouded his judgment with respect to off-duty activities." Given this evidence, the Board was not required to find that any psychological stress or drinking problems caused the misconduct or required further inquiry. See *Glenville v. Police Board*, 197 Ill. App. 3d 583, 532 N.E.2d 490 (distinguishing *Walsh*); *McCoy v. Kamradt*, 136 Ill. App. 3d at 557-58 (distinguishing *Walsh*).

Kappel also focuses on his cooperation with the government in the undercover investigation. The unique circumstances involving Kappel's working undercover for several years following his misconduct permitted Kappel the necessary time and opportunity to earn the praise of three superiors and many commendations. Notwithstanding these unusual circumstances, the Board is not precluded from emphasizing the misconduct in 1981, when Kappel committed the acts with which he was charged. The Board was also free to consider that Kappel's cooperation with the government was originally induced by a promise of immunity from prosecution for very serious criminal offenses. In return for his cooperation, Kappel was spared a possible felony conviction.

In regard to Kappel's otherwise exemplary record prior to 1981, while the Board may consider such evidence in mitigation, it is not required to place dispositive weight on such evidence. The Board is not required to suspend, rather than discharge, an officer solely because he has provided numerous years of good service, even where some of those years are subsequent to the misconduct. See, *e.g., Allman v. Police Board*, 140 Ill. App. 3d 1038, 489 N.E.2d 929 (discharge upheld for carrying firearm while drinking, possessing an unregistered firearm and unnecessarily displaying or pointing firearm at several peo-

ple, notwithstanding officer's 23 years of service and numerous commendations); *Carrigan v. Board of Fire & Police Commissioners*, 121 Ill. App. 3d 303, 459 N.E.2d 659 (discharge upheld for misuse of gun notwithstanding rank and years as officer). See also *O'Malley v. Board of Fire & Police Commissioners*, 182 Ill. App. 3d at 1025 (demotion upheld for negligence while on duty, notwithstanding 17 years of unblemished record).

In regard to all of the mitigating evidence presented by Kappel generally, the question before us is not whether this court would conclude in view of the mitigating circumstances that a different penalty would have been more appropriate. (*Sutton v. Civil Service Comm'n* (1982), 91 Ill. 2d 404, 411, 438 N.E.2d 147.) These factors were before the Board for it to consider in selecting the appropriate discipline. (*Kloss v. Board of Fire and Police Commissioners*, 96 Ill. 2d 252, 449 N.E.2d 845.) Our review is narrowly restricted to the question of whether, in view of all the circumstances presented, the Board's choice of discharge was unreasonable, arbitrary or unrelated to the needs of the service. *Kloss v. Board of Fire & Police Commissioners*, 96 Ill. 2d 252, 449 N.E.2d 845.

Even if we would not have been led to discharge Kappel pursuant to the mitigating evidence presented, which might well have been the case, this court is bound by the strict standard of review, and we cannot say that the Board's decision to discharge Kappel is arbitrary, unreasonable, or unrelated to the requirements of the service. The evidence would justify a finding of a violation of the Department's Rule 2: "Any action or conduct which impedes the department's efforts to achieve its policy and goals or brings discredit upon the department." Kappel's conduct could reasonably be viewed as "some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position." *Department of Mental Health*, 85 Ill. 2d at 551.

Kappel relies on *Kreiser v. Police Board* (1977), 69 Ill. 2d 27, 370 N.E.2d 511, to support his argument that his conduct did not warrant discharge. In *Kreiser*, the court found discharge was unwarranted where a police officer was discharged for operating his vehicle without a proper license, disobeying the order of a superior officer, making a false oral statement to a superior officer and leaving the police station without being properly relieved and without logging out. In contrast, the conduct here, involving the illegal possession of automatic and semi-automatic rifles and the illegal sale of an unregistered

automatic handgun with an obliterated serial number, is considerably more serious than the failure to license a car or not logging out at the police station.

Kappel's reliance on *Kirsch v. Rochford* (1977), 55 Ill. App. 3d 1042, 371 N.E.2d 899 (court found police officer's discharge was unwarranted where he was refused permission to board a plane at O'Hare because of his intoxicated condition), and *Massingale v. Police Board* (1986), 140 Ill. App. 3d 378, 488 N.E.2d 1289 (court found police officer's discharge was unwarranted where she had been intoxicated while off duty, and driving a car with two open containers of alcohol), is misplaced. As previously noted, Kappel's conduct, unlike that of the officers in *Kirsch* and *Massingale*, was not the result of any transitory mental impairment or addiction.

Finally, we have considered the question of precisely which order of the Board is before us on appeal, notwithstanding the parties' presumption, without discussion, that it is the Board's 1985 and 1986 discharge orders and not the final July 9, 1987, suspension order entered by the Board under protest, to which we are required to apply the relevant standard of review.

◼ Only final orders of the Board can be appealed in an administrative review proceeding. (Ill. Rev. Stat. 1989, ch. 110, par. 3—102.) The applicable standard of review must be applied to that final order. No other case has discussed the issue of which order is to be examined on appeal where the final administrative agency order was entered under protest and in compliance with a circuit court remand order. In two such cases, however, this court, albeit without discussion, presumed the appeal to be from the administrative agency's original, *preferred* decision—not the agency's final, mandated decision entered after remand.

In *Kvidera v. Board of Fire & Police Commissioners*, the police board discharged a police officer. The circuit court found the sanction too severe and remanded with instructions to impose an appropriate lesser sanction. On remand, the police board again discharged the officer. The circuit court refused to confirm the discharge. The board appealed, and this court dismissed the appeal because the order was not appealable. The circuit court again remanded to the board to impose a penalty less than discharge. The board finally complied by suspending the officer for 30 days. The board appealed. Without discussion, this court applied the "arbitrary and unreasonable" standard of review to the police board's original *discharge* order—not to the forced suspension order. We "reverse[d] the court's order to the Board to impose a penalty exclusive of terminations" and we "modif[ied] the Board's dis-

ciplinary decision to impose a penalty of discharge." *Kvidera*, 192 Ill. App. 3d at 965.

Similarly, in *Brown v. Civil Service Comm'n* (1985), 133 Ill. App. 3d 35, 478 N.E.2d 541, the Civil Service Commission discharged a court reporter employed by the Industrial Commission from his position. The circuit court found the sanction too severe and remanded with instructions to reinstate the employee and impose a lesser sanction. On remand, the Civil Service Commission complied by reinstating the employee and imposing a 120-day suspension. The circuit court affirmed the modified penalty, and the Industrial Commission appealed to the appellate court. Without discussion, this court applied the "arbitrary and unreasonable" standard of review to the Civil Service Commission's original discharge order—not to the forced suspension order. We "affirm[ed] the decision of the trial court, reversing the decision of the Civil Service Commission and remand[ed] for imposition of a lesser penalty." *Brown*, 133 Ill. App. 3d at 42.

In view of *Kvidera* and *Brown*, we concur with the parties that the essence of the matter appealed from is the circuit court's 1985 and 1986 orders directing the Board to vacate its March 1985, January 1986, and June 1986, orders discharging Kappel and to impose a lesser penalty; and not the circuit court's March 15, 1989, affirmance of the Board's July 9, 1987, suspension order.

■ For the foregoing reasons, the decision of the circuit court ordering the Board to impose a lesser penalty than discharge is reversed. We remand the cause to the Board, with leave to vacate the order imposing the suspension and to reinstate its earlier order of discharge. However, we note that, pursuant to *Jones v. Board of Fire & Police Commissioners* (1984), 127 Ill. App. 3d 793, 797, 469 N.E.2d 393 (it is within the Board's authority on remand to exercise its discretion in accordance with the law, provided that the Board does not act in any way which would be contrary to the holdings stated herein), the Board is not compelled on remand to reinstate its earlier discharge order, if the Board under its present evaluation chooses instead to let the lesser penalty stand.

Circuit court judgment reversed; cause remanded to Police Board with leave to reinstate its prior discharge order.

LORENZ, P.J., and MURRAY, J., concur.