2022 IL App (1st) 211279-U
No. 1-21-1279
Order filed December 27, 2022

First Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL GOMEZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CH 8180 |
| | ) | |
| THOMAS J. DART, in His Official Capacity as Sheriff of | ) | |
| Cook County; THE COOK COUNTY SHERIFF'S | ) | Honorable |
| MERIT BOARD; and COOK COUNTY, | ) | Celia G. Gamrath, |
| | ) | Judge, presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held*:     Affirming Merit Board's decision where Board's findings of fact were not against the manifest weight of the evidence and its decision to terminate Sheriff's police officer for cause was not arbitrary or unreasonable.

¶ 2     Former Cook County Sheriff's police officer Michael Gomez appeals the decision of the Cook County Sheriff's Merit Board terminating his employment. The Board found Gomez violated Sheriff's Office rules, orders, and policies by (i) entering a strip club while on duty

and in uniform, (ii) arranging for a club employee to serve drinks at a bachelor party, (iii) getting into an argument with her, and (iv) making false or misleading statements to investigators. Gomez contends (i) the Board's finding that he violated Sheriff's rules and orders was against the manifest weight of the evidence and (ii) terminating him was arbitrary and unreasonable. We affirm. The evidence supports the Board's findings. Further, we find nothing arbitrary or unreasonable or unrelated to the requirements of service in the Board's decision to discharge Gomez.

¶ 3                                        Background

¶ 4         Gomez began working as a correctional officer for the Cook County Sheriff's office in February 1998. He was promoted to police officer two years later and assigned to a patrol unit from 2006. In February 2013, Gomez hosted a bachelor party for an acquaintance at Pick Ups, a bar in Ford Heights. Gomez asked Tori Salter, an Atlantis Gentlemen's Club employee, to help serve drinks at the party in exchange for tips. Toward the end of the party, Gomez and Salter got into an argument. Salter left the bar and called 911, reporting Gomez had forced her to perform oral sex on him and his friends and threatened her with arrest if she refused. She also alleged Gomez used cocaine at the party. The 911 operator told Salter to go to a hospital for a rape kit test.

¶ 5         Cameron Pon, Director of the Sheriff's Office of Professional Review (OPR), interviewed Salter at the hospital and later that night went to Pick Ups to assess the scene and interview the owner. Pon was told by the owner that she gave Salter $50 at the end of the night after Salter complained about not earning any money.

¶ 6          As part of the investigation, Gomez took a urine test two days after the party. Though the test came back negative for drugs, a DNA test confirmed saliva found on Salter's chest belonged to Gomez.

¶ 7          Pon first interviewed Gomez a year after the party. Gomez told him he had met Salter at Atlantis and asked her to serve drinks at the bachelor party. Although Salter set up an area at the bar to perform lap dances, he denied asking her to do so. Likewise, he denied she performed dances for him or anyone or had physical contact with her. He rejected Salter's claims of drug use and sexual activity, which allegations Pon determined the evidence did not support. In a later interview, Pon asked Gomez how his saliva came into contact with Salter's chest. Gomez did not provide an explanation. Later, he testified his union representative had advised him not to speculate.

¶ 8          On June 21, 2016, the Sheriff's Office filed a complaint with the Cook County Sheriff's Merit Board seeking to terminate Gomez alleging he had entered Atlantis in uniform, asked Salter to serve drinks at the bachelor party, and gave false or misleading statements to investigators, all of which reflected negatively on the Sheriff's Office and violated multiple Sheriff's Department Rules and Regulations.

¶ 9          The Merit Board held a hearing over two days in December 2016. Salter testified that Gomez hired her to serve drinks and perform lap dances at the bachelor party. She said when she arrived at the bar, she changed into a bikini top and a thong. Party attendees were playing cards, and she performed lap dances for several of them. She also performed private lap dances for Gomez, and she, Gomez, and others used cocaine. She claimed that toward the end of the night, Gomez forced her to give him oral sex. and at some point, his mouth touched her chest. She said he held her head down, but she was eventually able to get away from him and left the

bar without speaking to anyone. She initially said she went to a police station but later called 911 and was told to go to a hospital for a rape kit test.

¶ 10        The Pick Ups waitress who worked at the party testified Salter, who wore a bikini, did not serve drinks but instead was rubbing men's backs. She did not see sexual activity between Gomez and Salter. Five of Gomez's friends at the party testified that they saw no sexual activity, drug use, or lap dances and reiterated Gomez's assertion that he got into an argument with Salter. All five admitted they had spoken to Gomez about Salter's allegations.

¶ 11        During his testimony, Gomez acknowledged that in addition to police calls, he occasionally went into Atlantis in uniform for food because it was the only place open that late. He got the food in the club lobby and did not enter the dance area. When there, he occasionally spoke to Salter, who told him she had a side business working at private parties. The two exchanged phone numbers. In planning the bachelor party, he arranged for Salter to assist the bar's regular waitress with serving food and drinks. He conceded that, unlike the bar's waitress, Salter dressed in a bikini top and little shorts and had set up an upstairs area to perform lap dances. He denied, however, that he asked her to perform lap dances or that she performed dances for him or anyone else. He also denied using drugs or seeing drug use at the party.

¶ 12        Gomez acknowledged he and Salter got into an argument. Gomez claimed Salter was upset she had not made money because his friends were cheap. Gomez said Salter was agitated and yelling and swearing at him. He said he, too, became agitated and yelled back at her, walked away, and left the bar with a friend.

¶ 13        Gomez denied assaulting Salter, using force against her, or threatening her with arrest. He said he only touched her when they shook hands on her arrival and, otherwise, had no physical contact with her. He admitted that, on the advice of his union representative, he failed to

explain to Pon why his saliva was found on Salter's chest. Still, at the hearing, he suggested it may have occurred during the argument when they were face to face and shouting at one another. Or, Salter may have taken it from a cup he was drinking from and placed it there. Salter denied lying to Pon or investigators.

¶ 14     After the hearing, the Board issued its decision to terminate Gomez. The Board concluded the Sheriff had not proven by a preponderance of the evidence that Gomez used cocaine or committed a sexual assault or battery on Salter. But the Board found Gomez violated Sheriff's rules and regulations by (i) organizing and holding the February 2013 bachelor party; (ii) visiting a strip club, a prohibited establishment, while in uniform, on more than one occasion, and (iii) being evasive and lying to OPR investigators about what occurred at the party.

¶ 15     Gomez filed a petition for administrative review in the circuit court. Gomez argued the Board's findings of fact were without justification, namely, that he engaged in conduct unbecoming of a police officer, failed to conduct himself in a professional and ethical manner, or provided false and misleading information during the investigation. Further, he contended that in the absence of evidence he engaged in the alleged conduct, the Board's decision to terminate him was without cause.

¶ 16     After argument, the circuit court found sufficient evidence to support the Board's decision to terminate Gomez but that the board failed to "articulate what conduct and acts violated which rule, regulation, or order Gomez was charged with in the complaint." Accordingly, the court remanded for the Board to make specific findings of fact and credibility determinations and explain how Gomez violated each rule, regulation, or order.

¶ 17     On remand, the Board again ordered termination. The Board acknowledged conflicting testimony between Salter and the other witnesses about what occurred at the party but found it

undisputed Gomez hired Salter, an employee of a strip club, to attend the party and got into an argument with her at the end of the night. The Board found Gomez's testimony that he hired Salter only to serve drinks incredulous and did not place great weight on the testimony of his friends with whom he had discussed the allegations. The Board concluded Gomez failed to conduct himself in a professional and ethical manner in violation of Sheriff's Order 11.2.20.0 and several enumerated Sheriff's orders, rules, and policies.

¶ 18    The Board also found Gomez violated Sheriff's Order 11.2.20.1, which subjects officers to discipline for giving false or misleading statements or misrepresenting or omitting material information in an investigation. The Board found Gomez lied to OPR investigators by claiming he had no physical contact with Salter even though his DNA was found on her chest. The Board further concluded Gomez violated a specific general order prohibiting officers from visiting, entering, or patronizing, other than in the strict performance of duty, establishments featuring strip tease and exotic dancers when he patronized the Atlantis club for carryout food.

¶ 19    Gomez filed a second complaint for administrative review, arguing the Board's decision contained the same inadequacies that led to the remand. After briefing, the circuit court denied Gomez's complaint for administrative review and affirmed the Board's decision to terminate him.

¶ 20                                    Analysis

¶ 21                        Manifest Weight of the Evidence

¶ 22    Gomez contends the Board's findings that his conduct in connection with the bachelor party warranted termination were against the manifest weight of the evidence. In an appeal from the judgment of an administrative review proceeding, we review the administrative agency's decision and not the circuit court's decision. *Krocka v. Police Board*, 327 Ill. App.

3d 36, 46 (2001). The scope of review requires a two-step analysis. *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 550 (1981). We determine if the administrative agency's findings of fact are contrary to the manifest weight of the evidence. *Id.* In doing so, we treat the findings and conclusions of the administrative agency as *prima facie* correct. *Kappel v. Police Board*, 220 Ill. App. 3d 580, 588 (1991). Similarly, assessment of witness credibility, determinations about the weight accorded to testimony, and inferences to be drawn from evidence fall within the province of administrative agency. *Merrifield v. Illinois State Police Merit Board*, 294 Ill. App. 3d 520, 529 (1997) (citing *Parro v. Industrial Comm'n*, 167 Ill. 2d 385, 396 (1995)). We do not reweigh the evidence or substitute our judgment for the agency's. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006). When sufficient evidence in the record supports an administrative agency's findings, the decision will not be reversed. *Id.*

¶ 23    Then, we determine if the findings of fact provide a sufficient basis for the Board's conclusion that cause for discharge existed. *Crowley v. Board of Education of the City of Chicago*, 2014 IL App (1st) 130727, ¶ 29. The Board sits in the best position to resolve the effect of an officer's conduct on the department's operations, so we give considerable deference to its determination of cause. *Robbins v. Department of State Police Merit Board*, 2014 IL App (4th) 130041, ¶ 39.

¶ 24    Preliminarily, Gomez contends the circuit court erred in finding the Board's decision after remand sufficiently explained its rationale for terminating him. According to Gomez, the second decision suffered from the same deficiencies as the first because it failed to articulate specific conduct that violated specific rules and regulations. Gomez asserts that in the absence of specific findings, the circuit court erred in ruling in the Board's favor. Because we review

the Board's decision, we do not pass judgment on the circuit court's finding that the Board adequately explained its rationale in the second order. Even so, comparing the two orders shows that the Board adhered to the circuit court's instructions and more fully articulated its reasoning in the second order.

¶ 25    Turning to the merits, Gomez argues the Board's conclusory findings that he brought disrepute on the Sheriff's office by holding a bachelor party, hiring Salter, and getting into a heated argument with her at the end of the night was against the manifest weight of the evidence. We disagree. The Board expressly noted that as a sworn officer, Gomez was required to conduct himself in a professional manner on and off duty. The Board's findings—that hiring Salter, an employee of a strip club to serve drinks while wearing a bikini, getting into an argument with her, and screaming at her, damaged the reputation of the Sheriff's office—meet the manifest weight of the evidence standard.

¶ 26    In addition, Gomez contends the Board's finding that he hired Salter to perform lap dances contradicted multiple witnesses. Gomez asserts that Salter was the only witness who testified she gave lap dances and, given that the Board found her allegations regarding drug use and sexual assault were not proven, the Board's findings that Salter performed lap dances or he touched her inappropriately were against the manifest weight of the evidence.

¶ 27    As noted, weighing evidence and assessing witness credibility falls within the Board's province. *Merrifield*, 294 Ill. App. 3d at 529. The Board's decision not to place significant weight on the testimony of Gomez's friends, with whom he had discussed the allegations before the hearing, was reasonable. Also reasonable was for the Board to conclude Gomez hired Salter to perform lap dances based on his testimony that he knew she worked at a strip club, she was the only wait staff wearing a bikini top and shorts, and she had set up an area for

lap dances. The contradictory testimony as to whether she performed lap dances does not negate the Board's finding that by hiring Salter, Gomez engaged in conduct negatively impacting the reputation of the Sheriff's office.

¶ 28    Gomez contends the Board's finding that he was evasive or lied to OPR investigators was against the manifest weight of the evidence. The Board concluded Gomez was not being truthful when he said he had no physical contact with Salter given his saliva was found on Salter's chest. Gomez asserts he did not know how his saliva ended there and refused to speculate based on advice from his union representative. He argues that refusing to speculate is not lying or being evasive. He asserts the only evidence of physical contact with Salter was her self-serving testimony, and she was found to be lying about allegations and should not have been believed on this factual issue. He asserts that in the absence of evidence of lap dances or physical contact with Salter, the Board's conclusion that he lied to investigators was against the manifest weight of the evidence.

¶ 29    The DNA test showed Gomez's saliva on Salter's chest. Gomez does not contest that finding. Based on the DNA evidence and witness testimony, the Board concluded that Gomez must have had physical contact with Salter and lied to investigators when he said he had not. We will not substitute our judgment for the Board's nor reverse it when sufficient evidence in the record supports the Board's decision. *Marconi*, 225 Ill. 2d at 534.

¶ 30    Lastly, Gomez asserts the circuit court order includes multiple factual mistakes, and he suggests we remand for the circuit court to address the errors and reconsider its decision. As noted, we review the decision of the Board. *Krocka,* 327 Ill. App. 3d at 46. Moreover, the Board and not the circuit court makes findings of fact. Assuming Gomez is claiming the circuit court's order reflects factual errors by the Board, we address each in turn.

¶ 31        Gomez notes the circuit court's order states he violated Rule 01-A.12.15, which prohibits officers from taking lunch breaks on premises where the sale of alcohol is the primary business. Nevertheless, he asserts he did not violate this rule because he got his lunch at Atlantis and ate in his car, not inside the club. Assuming this is true, it was not unreasonable for the Board to infer that even if Gomez took his lunch to go and ate in his car, he did so on the club's premises, such as in the parking lot. Moreover, the Board found that in getting his lunch at Atlantis, Gomez violated Rule 00-01-A.13.31. That Rule states,, in part, that members are "prohibited from visiting, entering, or patronizing, other than in the strict performance of duty, establishments featuring strip-tease and exotic dancers, B-girls, lap-dancers." Gomez does not contest this finding, and it is not against the manifest weight of the evidence.

¶ 32        Next, Gomez asserts the circuit court order reflects three evidentiary errors by the Board: (i) concluding he must have touched Salter because his saliva was found on her chest, despite his testimony suggesting that could have occurred during their heated argument; (ii) finding he hired Salter to perform lap dances and not just serve drinks, despite his testimony he never paid her; and (iii) discounting the testimony of his friends. In short, Gomez argues that throughout its decision, the Board "picked and chose" testimony and evidence supporting its decision and discounted evidence inuring in his favor. As noted, factual findings and credibility determinations come within the Board's province. *Merrifield*, 294 Ill. App. 3d at 529. We will not reweigh the evidence or substitute our judgment for the Board's. *Marconi*, 225 Ill. 2d at 534. The Board's findings that Gomez violated rules, regulations, and policies of the Sheriff's office and damaged the office's reputation were not against the manifest weight of the evidence. These findings include Gomez entering a strip club in uniform to purchase food on

multiple occasions, asking an employee of the club to serve drinks at a bachelor party, and getting into an argument with her.

¶ 33                                    Cause to Discharge

¶ 34        Gomez maintains the Board's decision to terminate him was arbitrary and unreasonable because it was not supported by the evidence. A police officer may not be discharged without cause. 65 ILCS 5/10-1-18(a) (West 2020). "Cause" means " 'some substantial shortcoming which renders [the employee's] continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his [discharge].' " *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105 (1983) (quoting *Fantozzi v. Board of Fire & Police Commissioners*, 27 Ill. 2d 357, 360 (1963)). The violation of even one rule or order may warrant discharge so long it is not arbitrary, unreasonable, or unrelated to the requirements of service. See *Malinowski v. Cook County Sheriff s. Merit Board*, 395 Ill. App. 3d 317, 322-23 (2009).

¶ 35        Because the Board, and not the reviewing court, stands in the best position to determine the effect of an officer's conduct on the department, reviewing courts give the Board's determination of cause heavy deference. *Valio v. Board of Fire & Police Commissioners*, 311 Ill. App. 3d 321, 330-31 (2000). Illinois courts recognize that "police departments, as paramilitary organizations, require disciplined officers to function effectively and have accordingly held that the promotion of discipline through sanctions for disobedience of rules, regulations and orders is neither inappropriate nor unrelated to the needs of a police force." *Siwek v. Police Board*, 374 Ill. App. 3d 735, 738 (2007). Thus, our review is limited to whether

the agency's decision was arbitrary, unreasonable, or unrelated to the requirements of service. *Id.*

¶ 36    Gomez maintains the Board's decision was arbitrary and unreasonable because the Board failed to consider all of the evidence and testimony, made incorrect findings of fact, and failed to articulate in its decision why discharge was warranted.

¶ 37    As to the sufficiency of evidence and the Board's findings of fact, Gomez merely reiterates his earlier arguments, which, as noted, do not support reversal. And, contrary to Gomez's contention, the Board explained its reasons for finding Gomez's conduct sufficiently severe to warrant discharge, including that he failed to conduct himself in a professional manner, which brought disrepute to the Sheriff's Office, entered the Atlantis club more than once while in uniform in violation of an explicit rule, and lied or was evasive with OPR investigators. The Board's order identifies multiple violations of Sheriff's Department Rules and Regulations, Orders, General Orders, and Policies, and Merit Board Rules and Regulations. Given all this, we find the Board's decision to terminate Gomez was neither arbitrary nor unreasonable and related to the requirements of service.

¶ 38    Affirmed.